**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 28, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

In re: TOMMY DEAN JOHNSON and
CANDICE ANN JOHNSON,

    Debtors,

---

TOMMY DEAN JOHNSON;
CANDICE ANN JOHNSON,

    Plaintiffs - Appellees,

    v.

KEITH SMITH, individually and as
Vice President of M&M Auto Outlet -
Wyoming, Inc.; M&M AUTO
OUTLET - WYOMING, INC., a
Wyoming Corporation,

    Defendants - Appellants.

No. 05-8089

---

**APPEAL FROM THE UNITED STATES**
**BANKRUPTCY APPELLATE PANEL**
**(BAP No. WY-04-87)**

---

Submitted on the briefs:

Ken McCartney and Carrol Nelson, Law Offices of Ken McCartney, P.C.,
Cheyenne, Wyoming, for Plaintiffs-Appellees.

Stephen R. Winship, Winship & Winship, P.C., Casper, Wyoming, for
Defendants-Appellants.

---

Before **KELLY**, **McKAY**, and **BRISCOE**, Circuit Judges.

**McKAY**, Circuit Judge.

M&M Auto Outlet–Wyoming, Inc. appeals the merits portion of a Bankruptcy Appellate Panel decision affirming the Wyoming bankruptcy court's determination that M&M willfully violated the automatic stay of 11 U.S.C. § 362 by repossessing a pickup truck after a Chapter 13 bankruptcy petition had been filed. M&M's appeal presents a host of issues, including the finality of the BAP decision, the burden of proof required by § 362, the meaning of "willful" under § 362, and the application of that definition to M&M's actions.

## BACKGROUND

This tortured tale about "a truck and those that would possess it" began when Debtors Tommy Dean and Candice Ann Johnson purchased a pickup truck from M&M. *Johnson v. Smith (In re Johnson)*, 330 B.R. 880 (table), 2005 WL 2300370, at *1 (BAP 10th Cir. Sept. 7, 2005). Pursuant to a Retail Installment Contract and Security Agreement (the "Sales Contract") signed by the parties on March 30, 2004, Debtors agreed to purchase the vehicle for $13,138. The Sales Contract specified that Debtors would make a $2,300 down payment, consisting of $1,500 previously paid to M&M for the failed purchase of a different vehicle,

$500 in cash, and a deferred $300 payment due April 13, 2004.[1] On March 30, 2004, Debtors paid the additional $500, took possession of the vehicle, and received a Bill of Sale. The Bill of Sale listed "Wells Fargo Fin" as the lienholder.[2] It contained no contingencies other than a statement that the sale would not "become binding until accepted by the DEALER or his authorized representative." (App. at 61 (Decision on Debtors' Am. Compl. for Turnover, Sanctions and Injunctive Relief at 4, Adv. No. 04-2036 (Bankr. D. Wyo. July 30, 2004) [hereinafter Bankr. Ct. Order]).) M&M's authorized representative executed the Bill of Sale on March 30, 2004.

Debtors financed the rest of the purchase price. The terms of the financing required repayment over thirty months at a sixteen percent interest rate, with the first installment due on April 30, 2004. The parties understood that financing would be arranged through Wells Fargo Financial, and the Sales Contract contained an assignment provision apparently for that purpose. Wells Fargo was not, however, a party to the Sales Contract. Rather, the Sales Contract listed M&M as the seller, required Debtors to make payments to the seller, and granted M&M a security interest in the vehicle.

M&M informed Debtors that Wells Fargo would contact them within ten

---

[1] Debtors promptly tendered the $300 payment.

[2] Neither Wells Fargo nor M&M ever properly perfected the lien in accordance with Wyoming law.

days of the vehicle purchase, although the parties dispute the purpose of this call. According to M&M, the call was intended to allow Wells Fargo to conduct a loan interview, a fact which M&M alleges Debtors were aware of given their past attempts to finance a vehicle purchase with M&M. Debtors believed the call was meant merely to inform them how to make loan payments. Debtors assumed, based on a previous vehicle purchase through M&M and a document entitled "M&M Auto Outlet Casper*Gillette*RockSprings Your [sic] Approved!" that appeared to indicate loan approval, that Wells Fargo had already approved the financing arrangement. (App. at 61-62 (Bankr. Ct. Order at 4-5).)

Regardless, Wells Fargo either did not call Debtors or was unable to reach them. Testimony illustrated that on or around April 25, 2004, Debtors called Wells Fargo in order to ascertain how to make the upcoming initial loan payment. Wells Fargo informed them that it had no account in their name. Debtors then called M&M. M&M required that Debtors supply additional paperwork, which they apparently delivered on April 30, 2004, the due date for the first payment. According to Debtors, M&M represented that it would contact Wells Fargo to obtain the payment information for Debtors, but did not do so. Debtors, therefore, did not make their initial loan payment.

Just days later, on May 6, 2004, Debtors filed a Chapter 13 bankruptcy petition. That petition listed Wells Fargo as a secured creditor and M&M as an unsecured creditor. The court sent out notice of Debtor's bankruptcy to all listed

creditors. Debtors erroneously listed M&M's physical address on the petition, rather than M&M's postal mailing address. Accordingly, M&M never received official notice of the bankruptcy proceeding.

On either May 10 or May 13, 2004, M&M repossessed the pickup truck. On May 13, 2004, Debtor's attorney contacted M&M and spoke to its vice-president, informing him of the bankruptcy and demanding the vehicle's immediate return. M&M refused because the vice-president believed that the call was merely a ruse put on by Debtors in an attempt to illegally recover the pickup truck.

A flurry of litigation followed. On May 20, 2004, Debtors filed a complaint against M&M alleging violation of the automatic stay under 11 U.S.C. § 362 and seeking declaratory and compensatory relief. Debtors also filed a motion for a temporary restraining order ("TRO") seeking to enjoin any potential sale of the vehicle and to obtain possession of the vehicle. The bankruptcy court granted Debtor's TRO motion and ordered M&M to deliver the vehicle to Debtors. Debtors moved to amend their complaint in order to request turnover of the vehicle title in addition to the previously requested relief. Debtors also filed a separate motion requesting turnover of the vehicle title.

M&M complied with the TRO order. Due to confusion over the vehicle's location at the delivery site not attributable to M&M, however, Debtors were unable to retrieve the vehicle. As a result, Debtors filed a "Motion for Expedited

Impositions of Sanctions and Order Directing Marshall to Collect Property." The motion was rendered moot when, at an expedited hearing on the motion, M&M explained that it had delivered the vehicle and its location at the delivery location became apparent. Debtors nevertheless modified their motion to request turnover of the vehicle title.

The bankruptcy court then granted Debtors' motion to amend their complaint. Following Debtors' filing of the amended complaint, M&M moved to dismiss the action. Thereafter, M&M filed a motion to modify the automatic stay in order to repossess and sell the pickup truck or, in the alternative, to require Debtors to assume or reject the Sales Contract. The bankruptcy court denied M&M's motion to dismiss and held an evidentiary hearing in order to address the outstanding motions.

The bankruptcy court subsequently granted Debtors' various motions requesting the vehicle title and denied M&M's request for relief from the automatic stay. In addition, the bankruptcy court ruled in favor of Debtors on their amended complaint, finding that M&M willfully violated § 362. The bankruptcy court deferred assessing damages until it held an additional evidentiary hearing on that issue.

M&M issued a new title reassignment pursuant to the bankruptcy court's order. That title, however, listed M&M as the lienholder rather than Wells

Fargo.[3] As a result, Debtors were unable to register and license the vehicle without providing the Wyoming motor vehicle department with a lien release or a copy of the security agreement. Although M&M faxed the necessary materials to the proper state official, Debtors refused to proceed with the registration and licensing. Thus, the pickup truck sat unused.

The bankruptcy court then held the evidentiary hearing to determine the amount of damages stemming from M&M's willful violation of the stay. In its order on damages, the bankruptcy court required M&M to provide Debtors with a title clear of M&M's lien and awarded $6,198.23 in damages. Specifically, the bankruptcy court awarded Debtors $937.50 for loss of use of the pickup truck, $5,028.50 in attorney's fees, and $232.23 in costs.

M&M appealed the grant of the TRO, the denial of the motion to dismiss, the order requiring turnover of the vehicle title, and the merits decision to the BAP. The BAP affirmed the bankruptcy court's decision on the merits, but reversed the bankruptcy court's damages award on loss of use due to insufficient evidence, vacated the attorney's fees, and remanded that issue for further proceedings. Those proceedings regarding attorney's fees remain outstanding.

M&M now appeals the merits portion of the BAP's decision.

---

[3] The bankruptcy court found that the title listed M&M as the holder of a lien in the amount of $0.00.

**ANALYSIS**

**I.    Jurisdiction**

On March 23, 2006, this court issued an order to show cause why this appeal should not be dismissed for lack of jurisdiction. Specifically, we questioned whether the BAP's decision was a final, appealable order when further proceedings were required to resolve damages. Recognizing that the BAP remanded only for a redetermination of attorney's fees, we now hold that our jurisdiction is appropriate under 28 U.S.C. § 158(d). *See Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 201-02 (1988) (promulgating "uniform rule that an unresolved issue of attorney's fees" under 28 U.S.C. § 1291, regardless of "the characterization of those fees by the statute or decisional law that authorizes them," does not affect finality of lower court orders); *see also Groetken v. Davis (In re Davis)*, 35 Fed. App'x 826, 828 (10th Cir. 2002) (unpublished) (analogizing jurisdictional holding in *Budinich* to § 158(d) and finding jurisdiction despite outstanding attorney's fee determination); *Unified People's Fed. Credit Union v. Yates (In re Yates)*, 2005 WL 50188, at *2-3 (BAP 10th Cir. Jan. 11, 2005) (unpublished) (examining various circuit court approaches to *Budinich* in determining that remand for attorney's fee determination does not nullify jurisdiction under § 158(d)). This conclusion is consistent with that of several of our sister circuits that have had occasion to examine the finality of bankruptcy orders where only attorney's fee calculations remain unresolved. *See, e.g.,*

-8-

*United States v. Rivera Torres (In re Rivera Torres)*, 432 F.3d 20, 22-23 (1st Cir. 2005) (stating that "[t]he fact that here we are operating under § 158(d) rather than § 1291 makes little difference . . . given '[t]he great similarity between an adversary proceeding in bankruptcy and an ordinary civil action'" (quoting *Estancias La Ponderosa Dev. Corp. v. Harrington ( In re Harrington )*, 992 F.2d 3, 6 n.3 (1st Cir. 1993)) (alteration in original); *Colon v. Hart (In re Colon)*, 941 F.2d 242, 245 (3d Cir. 1991) (analogizing to *Budinich* in determining that decision on merits was final regardless of whether or not attorney's fees had been quantified).

## II.     Automatic Stay Violation

Under § 362(a)(3), a Chapter 13 petition triggers a stay against any act aimed at obtaining possession of property belonging to the debtor's estate. Section 362(k)(1) provides in part that an individual injured "by any willful violation" of the automatic stay "shall recover actual damages, including costs and attorneys' fees."[4]

Although M&M appeals the BAP decision, we independently review the bankruptcy court's decision, conducting de novo review of its legal determinations and clear error review of its factual determinations. *Alderete v.*

---

[4] Section 362(k)(1) was previously designated subsection (h).  This opinion uses the most recent designation.

*Educ. Credit Mgmt. Corp. (In re Alderete)*, 412 F.3d 1200, 1204 (10th Cir. 2005).

M&M argues that the bankruptcy court failed to apply the proper burden of proof in analyzing whether M&M's repossession of the vehicle constituted a "willful" violation of the automatic stay. Specifically, M&M asserts that the evidence of its knowledge of Debtors' Chapter 13 petition should have been established by clear and convincing evidence, not by a preponderance of the evidence. As a consequence, M&M contends that the bankruptcy court erroneously concluded that M&M had sufficient knowledge of Debtors' Chapter 13 petition to willfully violate § 362.

### A.    Standard of Proof

The burden of proof needed to establish a willful violation under § 362(k)(1) is less than certain in this circuit. *Compare In re Sullivan*, 357 B.R. 847, 854 n.21 (Bankr. D. Colo. 2006) (employing preponderance of the evidence test, but noting "'difference of opinion among the courts regarding the proper standard of evidence to be used in an action to impose sanctions under § 362(h)'" (quoting *Clayton v. King (In re Clayton)*, 235 B.R. 801, 807 n.2 (Bankr. M.D.N.C. 1998))), *with Diviney v. NationsBank of Texas (In re Diviney)*, 211 B.R. 951, 961 (Bankr. N.D. Okla. 1997), *aff'd* 225 B.R. 762 (BAP 10th Cir. 1998) (applying clear and convincing standard). Indeed, the BAP decision at issue on appeal pointed out the intra-circuit divergent positions. Unfortunately, its attempt

to resolve the issue only further jumbled it.

The BAP decision here correctly concluded that willful violations of the automatic stay provision must be established by a preponderance of the evidence. In arriving at this conclusion, the panel suggested that the *Diviney* panel's choice of the clear and convincing standard was merely applying, without considering, the standard employed by the district court in that case. A plain reading of *Diviney* belies that assertion. In view of our affirmance of the BAP's correct application of the preponderance of the evidence standard, we make clear that *Diviney* incorrectly applied the wrong standard of proof.

In *Grogan v. Garner*, 498 U.S. 279 (1991), the Supreme Court stated: "Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.'"[5] *Id.* at 286 (quoting *Herman &*

---

[5] An overwhelming majority of courts addressing this issue have elected the preponderance of the evidence standard, a number basing that decision upon *Grogan* and this quote in particular. *See*, *e.g.*, *Westman v. Andersohn (In re Westman)*, 300 B.R. 338, 342 (Bankr. D. Minn. 2003); *In re Clayton*, 235 B.R. at 807 n.2; *Elder-Beerman Stores Corp. v. Thomasville Furniture Indus. Inc. (In re Elder-Beerman Stores Corp.)*, 206 B.R. 142, 155 (Bankr. S.D. Ohio 1997), *overruled on other grounds*, 250 B.R. 609 (S.D. Ohio 1998); *In re Sharon*, 200 B.R. 181, 199 (Bankr. S.D. Ohio 1996), *aff'd* 234 B.R. 676 (BAP 6th Cir. 1999); *Estep v. Fifth Third Bank of N.W. Ohio (In re Estep)*, 173 B.R. 126, 129 (Bankr. N.D. Ohio 1994); *see also Heghmann v. Indorf (In re Heghmann)*, 316 B.R. 395, 404-05 (BAP 1st Cir. 2004); *In re Gossett*, 369 B.R. 361, 375 (Bankr. N.D. Ill.

(continued...)

*MacLean v. Huddleston*, 459 U.S. 375, 389 (1983) (citing cases concerning termination of parental rights, civil commitment, and deportation as examples of "particularly important individual interests or rights")). In *Grogan*, fraud victims obtained a judgment in their favor, but were forced to file to have that judgment excepted from discharge under 11 U.S.C. § 523(a) when the debtor filed for bankruptcy in an attempt to discharge the judgment. Resolving the matter required a determination as to the level of proof necessary to obtain an exception from discharge. The Supreme Court compared the purposes of the bankruptcy law's fresh-start policy with the need to dispense justice to perpetrators of fraud and concluded that the preponderance of the evidence standard achieved a "fair balance between these conflicting interests." *Id.* at 287.

No aspect of the instant circumstance suggests that a stricter standard should apply. The automatic stay is crucial to effecting the fresh-start policy, *see Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986), and no dishonest action by Debtors warrants disciplining our application of the preponderance of the evidence standard to rebalance the competing interests.

---

[5](...continued)
Apr. 24, 2007); *McCarthy v. Kramer Consulting, Inc. (In re McCarthy)*, 350 B.R. 820, 826 (Bankr. N.D. Ind. 2006); *In re Flack*, 239 B.R. 155, 162 (Bankr. S.D. Ohio 1999); *In re Dunn*, 202 B.R. 530 (Bankr. D.N.H. 1996). *But see, e.g., Bolen v. Mercedes Benz, Inc. (In re Bolen)*, 295 B.R. 803, 807 (Bankr. D.S.C. 2002) (applying clear and convincing standard); *In re Diviney*, 211 B.R. at 961 (same); *Brockington v. Citizens & S. Nat'l Bank of S.C. (In re Brockington)*, 129 B.R. 68, 70 (Bankr. D.S.C. 1991) (same).

Moreover, the competing interest of preserving creditor rights is constrained by § 362(d), which permits creditors to seek relief from the automatic stay.

Further support for employing the preponderance standard is found in the text of § 362(k)(1), which imposes a condition for recovery of punitive damages but not for actual damages, attorney's fees, or costs. *Cf. Ramirez v. Fuselier (In re Ramirez)*, 183 B.R. 583, 589 (BAP 9th Cir. 1995) ("The words 'shall recover' indicate that Congress intended that the award of actual damages, costs and attorney's fees be mandatory upon a finding of a willful violation of the stay."). The subsection's allowance for punitive damages only "in appropriate circumstances" suggests that a stricter evidentiary standard should apply only to a determination on punitives. The courts addressing this issue observe that imposition of punitive damages harkens to the original civil contempt actions that were required prior to enactment of § 362, and they draw a distinction between the standard used for assessing punitives as opposed to actual damages, attorney's fees, and costs. *See, e.g.*, *Green Tree Servicing, LLC v. Taylor*, ___ F. Supp. 2d ___, 369 B.R. 282, 289 (S.D. W. Va. Mar. 30, 2007) ("One point that seems clear from the different standards articulated is that 'punitive damages usually require more than mere willful violation of the automatic stay.'" (quoting *Heghmann*, 316 B.R. at 405)); *Ford Motor Credit Co. v. Florio (In re Florio)*, 229 B.R. 606, 608 (S.D.N.Y. 1999) ("It is well established that the 'clear and convincing' standard applies only when there is an adjudication of contempt for the violation

of an automatic stay; if that is not the case, the 'clear and convincing' standard of proof does not apply."); *Mack v. Pa. Dep't of Pub. Welfare (In re Mack)*, 46 B.R. 652, 657 (Bankr. E.D. Pa. 1985) ("In order to prevail on an action for contempt the moving party must prove his case by clear and convincing evidence rather than by the usual standard of a preponderance of the evidence."). Accordingly, we hold that willful violations of an automatic stay must be proven by a preponderance of the evidence.

## B.  Meaning of "Willful"

This court has yet to define "willful" in the § 362 context. A number of courts in this circuit cite *In re Diviney*'s definition of "willful." Although not incorrect, that definition is based in part on our decision in *C.I.T. Financial Services, Inc. v. Posta (In re Posta)*, 866 F.2d 364, 367 (10th Cir. 1989), which defined "willful" in the context of 11 U.S.C. § 523(a)(6).[6] *In re Posta* was abrogated, however, by *Kawaauhau v. Geiger*, 523 U.S. 57 (1998). *Geiger*, in analyzing the impact of the word "willful" as a modifier in the phrase "willful injury," held that in the § 523(a)(6) context, "nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Id.* at 61 (emphasis omitted). Because M&M questions the

---

[6] Section 523(a)(6) excepts from discharge any "willful and malicious injury by the debtor to another."

scope of what constitutes a "willful" violation of an automatic stay and at least one district court in this circuit has used *Geiger*'s restrictive definition in the automatic stay context,[7] we believe it necessary to provide a comprehensive definition of "willful" applicable to § 362.

We agree with the interpretation of "willful" provided by a large number of courts that have analyzed § 362(k)(1). Thus, we hold that in order to demonstrate a violation of § 362(k)(1), the debtor bears the burden of establishing, by a preponderance of the evidence, that the creditor knew of the automatic stay and intended the actions that constituted the violation; no specific intent is required. *See*, *e.g.*, *Brown v. Chestnut (In re Chestnut)*, 422 F.3d 298, 302 (5th Cir. 2005); *Fleet Mortgage Group, Inc. v. Kaneb*, 196 F.3d 265, 269 (1st Cir. 1999); *Cuffee v. Atl. Bus. & Cmty. Dev. Corp. (In re Atl. Bus. & Cmty. Corp.)*, 901 F.2d 325, 329 (3d Cir. 1990); *Knaus v. Concordia Lumber Co. (In re Knaus)*, 889 F.2d 773, 775 (8th Cir. 1989); *Goichman v. Bloom (In re Bloom)*, 875 F.2d 224, 227 (9th Cir.

---

[7] In *Jardine's Professional Collision Repair, Inc. v. Gamble*, 232 B.R. 799 (D. Utah 1999), the court followed *Geiger*'s reasoning in concluding that § 362's use of "willful" modified "violation" such that a stricter intent requirement was necessary. As aptly noted by the Colorado bankruptcy court, however:

> This construction is inconsistent with the fact that objections to dischargeability are narrowly construed because discharge is favored, while the automatic stay is a fundamental protection given to the debtor designed to stop all activity by creditors against the debtor or property of the estate during the pendency of a case, unless and until modified by court order.

*In re Gagliardi*, 290 B.R. 808, 819 n.25 (Bankr. D. Colo. 2003).

1989). Accordingly, a creditor's good faith belief that it had a right to the property is irrelevant. *See*, *e.g.*, *In re Chestnut*, 422 F.3d at 302; *Kaneb*, 196 F.3d at 268-69; *Tsafaroff v. Taylor (In re Taylor)*, 884 F.2d 478, 483 (9th Cir. 1989). Notice of the bankruptcy filing need not be formal or official to put a creditor on notice. *See*, *e.g.*, *Taylor*, ___ F. Supp. 2d ___, 369 B.R. 286 (collecting cases).

Applying this definition to the facts of the instant action, we cannot say that the bankruptcy court was clearly erroneous in finding that M&M possessed sufficient knowledge of Debtors' bankruptcy to warrant a conclusion that M&M's refusal to return the pickup truck constituted a willful violation of the automatic stay. On May 13, 2004, Debtors' attorney telephoned M&M's vice-president and demanded the immediate return of the repossessed vehicle. This fact was established via an affidavit submitted by Debtors' attorney. The M&M vice president testified that Debtors' attorney's manner was "abrupt and harsh" (App. at 242) and, in his experience, unlike that of other debtors' counsel. He also testified that Debtors' attorney failed to offer any documentation that might prove that Debtors in fact had filed for bankruptcy. As a result, he believed the telephone call was a scam designed to trick M&M into returning the otherwise lawfully repossessed vehicle.

The bankruptcy court determined that Debtors' counsel's telephone call to M&M's vice-president placed M&M on actual notice. We agree. First, the vice president testified that immediately after the telephone call with Debtors' counsel

ended, he "called several employees in to sound it off them" because he was suspicious about the veracity of the attorney's assertions. (App. at 243.) Second, the vice president testified that, because Debtors previously had filed for bankruptcy, he did not believe that enough time had passed since that filing to render them eligible to refile.[8] This belief about Debtors' eligibility to refile, coupled with M&M's suspicion following the telephone call, causes us to affirm the bankruptcy court's conclusion that "M&M had a responsibility to investigate further if it seemed [Debtors' counsel] was making false representations, despite [his] demeanor." (App. at 54 (Order on Damages at 4, Adv. No. 04-2036 (Bankr. D. Wy. Nov. 17, 2004) [hereinafter Damages Order]).)

The dissent overemphasizes the degree to which the bankruptcy court credited the vice-president's testimony and the relevancy of M&M's beliefs, reasonable or otherwise. By blending testimony given by M&M's vice-president at two separate hearings some three months apart, the dissent attempts to paint a picture different from that necessarily credited by the bankruptcy court in reaching its decision that M&M violated the automatic stay, a decision arrived at after lengthy and acrimonious litigation. While the finding of fact regarding the vice-president's suspicion was listed in the bankruptcy court's July 2004 order, it

---

[8] M&M argues that this good faith belief immunizes its violation of the automatic stay. As noted above, however, good faith belief is irrelevant in determining whether an automatic stay violation was willful.

-17-

was not until the October 2004 hearing on damages, however, that the vice-president alluded to having been rebuffed in his requests for verifying documentation. This claimed attempt to make inquiry was not stated by the vice-president at the earlier hearing. Rather, at the first hearing the bankruptcy court had before it Debtors' counsel's affidavit stating that bankruptcy notice was mailed and faxed to M&M prior to the telephone call. Despite the dissent's heavy reliance on the vice-president's alleged attempted inquiry, it is notable that the bankruptcy court made no such finding in any of its orders. In addition, M&M provided this testimony only after the bankruptcy court faced no less than three different excuses from M&M for its failure to return the vehicle, all of which were rejected by the bankruptcy court. Indeed, the vice-president's apparently crucial testimony about being refused proof of the bankruptcy filing was provided nearly three months after the bankruptcy court concluded that M&M had violated the automatic stay.

The dissent's reliance on the "reasonableness" of M&M's excuses is irrelevant. Willfulness is to be "liberally construed to bolster the protections of the automatic stay," *In re Sharon*, 234 B.R. at 688, and is "designed to ensure compliance with the stay by encouraging creditors to seek relief from the court whenever they are on notice of even a potential stay violation," *Commercial Bank v. Hundley (In re Hundley)*, 2007 WL 1042135, at *12 (D. Kan. Apr. 6, 2007). Accordingly, M&M's beliefs, however reasonable, have no bearing on

willfulness. *See, e.g.*, *In re Chestnut*, 422 F.3d at 302; *Kaneb*, 196 F.3d at 268-69; *In re Taylor*, 884 F.2d at 483. Moreover, the travails envisioned by the dissent in verifying Debtors' true bankruptcy status are fanciful: M&M is a sophisticated car dealership represented by counsel and admittedly quite familiar with repossession and bankruptcy procedure. M&M knew Debtors' name and address and could easily have called the clerk for the single bankruptcy court covering the area in which Debtors resided.

Although Debtors presented limited evidence about the nature of the phone call, they nevertheless proved the automatic stay violation by a preponderance of the evidence. That conclusion is consistent with the factual findings made by the bankruptcy court over the course of this protracted litigation, factual findings that we cannot say are clearly erroneous. *See Coons v. City of Silver Springs (In re Coons)*, 123 B.R. 649, 652 (Bankr. N.D. Okla. 1991) (observing that while "vague indefinite statement by the Debtors that they had filed bankruptcy, without giving the number of the case or where it was filed, would not be sufficient notice," fact that debtor's attorney telephoned creditor to inform it of bankruptcy filing imposed duty upon creditor "to inquire of the Court Clerk"); *In re Bragg*, 56 B.R. 46, 48-49 (Bankr. M.D. Ala. 1985) (finding knowledge where facts are sufficient to "cause a reasonably prudent person to make further inquiry" and stating that "simple telephone call to the clerk's office" would have resolved confusion); *cf. Sermersheim v. Sermersheim (In re Sermersheim)*, 97 B.R. 885, 888-89 (Bankr.

N.D. Ohio 1989) (finding uncontested affidavit of debtor's attorney that he provided telephonic notice of debtor's bankruptcy case sufficient to hold creditor in violation of § 362(h)).

### III.    Nature of the Sales Contract

M&M argues on appeal that the Sales Contract is an executory contract that, in accordance with 11 U.S.C. § 365, Debtors must either accept or reject. This argument, made in conjunction with M&M's contention that Debtors breached the Sales Contract, constitutes a clever attempt to force Debtors to cure their alleged breach while accepting the contract, as mandated under § 365(b)(1). Forcing Debtors to accept the Sales Contract at this late date also gives M&M a second chance to perfect its lien. Obviously, rejecting the Sales Contract would cause Debtors to lose the vehicle.

According to the widely adopted classic definition provided by Professor Countryman, an executory contract is "a contract under which the obligation of both the bankrupt and other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973). M&M contends that both parties' substantial remaining obligations render the Sales Contract executory. According to M&M, Debtors were obligated to make payment in full, provide

necessary residency and income verification documentation, and complete a financing interview with Wells Fargo. For its part, M&M remained obligated to transfer the vehicle title to Debtors after the final installment payment was tendered.

We disagree with M&M's characterization of the Sales Contract. As the bankruptcy court pointed out, Debtors paid the entire down payment in accordance with the deferred payment schedule and delivered all requested, extracontractual documentation. Nor do we disagree with the bankruptcy court's determination that Debtors' failure to complete the financing interview was not attributable to them. Debtors' sole obligation to tender installment payments and M&M's sole obligation to release the lien when handing over the vehicle title are insufficient to warrant classifying the Sales Contract as executory. A host of courts have found similar automobile retail installment contracts nonexecutory in nature. *See*, *e.g.*, *In re Steffen*, 181 B.R. 981, 985 (Bankr. W.D. Wash. 1995) ("[W]here (as here) the goods have already been delivered and the seller's only remaining obligation is delivery of title on receipt of full payment, there is no executory contract."); *Chrysler Credit Corp. v. Sparago (In re Sparago)*, 31 B.R. 552, 554 (Bankr. E.D.N.Y. 1983) (finding § 365 inapplicable "because a secured car loan is not an executory contract or lease"); *In re Shada Truck Leasing, Inc.*, 31 B.R. 97, 99-100 (Bankr. D. Neb. 1983) (finding retail installment sales contract for eight vehicles nonexecutory where debtor's only obligation was

payment and creditor's only obligation concerned limited repair warranty); *Riggs Nat. Bank of Wash., D.C. v. Perry (In re Perry)*, 25 B.R. 817, 819-20 (Bankr. D. Md. 1982) (finding installment sales contracts for vehicles not executory within meaning of § 365); *Brock v. Am. Sec. Bank (In re Brock)*, 23 B.R. 998, 1002 n.8 (Bankr. D.D.C. 1982) (noting, without deciding, that installment sales contract for vehicle purchase "would not ordinarily be deemed an executory contract simply because the sole and remaining obligation under the contract is that of the debtor to maintain periodic contractual payments called for in the contract itself"); *In re Whatley*, 16 B.R. 394, 398 (Bankr. N.D. Ohio 1982) (holding creditor's obligation to cancel lien "not sufficient to make the contract executory"). Accordingly, we affirm the nonexecutory classification of the Sales Contract.

## IV. Lien Avoidance

M&M also argues that the bankruptcy court improperly released M&M's lien on the vehicle when it ordered M&M to turn over the vehicle title. State law governs whether a property interest has been perfected. *See Butner v. United States*, 440 U.S. 48, 55 (1979). Under Wyoming law, perfecting a lien in vehicle requires a two-step process that, for unknown reasons, neither M&M nor Wells Fargo ever performed prior to Debtors' bankruptcy filing.[9]

---

[9] Wyoming requires that: (1) "[a] financing statement or security agreement must be filed in the office of the county clerk of the county in which the vehicle

(continued...)

Only after the bankruptcy court ordered return of the vehicle as well as the turnover of the vehicle title did M&M attempt to note a lien on the title in the amount of $0.00. This action failed to satisfy the requirements of Wyoming law, prompting the bankruptcy court to observe that M&M made the notation "out of spite." (App. at 55 (Damages Order at 5).)

The court also noted that M&M did not seek relief from the automatic stay before attempting to note its lien. As a result, it was entirely proper for the bankruptcy court to prevent M&M's attempt at perfecting its lien post-petition. *See Obuchowski v. Union Bank (In re Cottrell)*, 2005 WL 1899489, at *6 (Bankr. D. Vt. Aug. 1, 2005) (stating that creditor's failure to obtain relief from stay before attempt to perfect its lien post-petition rendered perfection voidable); *Am. State Bank v. Swearingen (In re Swearingen)*, 27 B.R. 379, 384-85 (Bankr. D. Kan. 1983) (finding that attempted compliance with state lien perfection law after bankruptcy petition was filed was proscribed by § 362(a)(4)). Thus, the bankruptcy court correctly characterized M&M as an unsecured creditor.

_____

[9](...continued)
is located" and (2) "[a] notation of the security interest must be endorsed on the certificate of title to the vehicle or motor vehicle, the endorsement to be made concurrently with the filing of the financing statement or security agreement." Wyo. Stat. Ann. § 31-2-801.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the determination by a preponderance of the evidence that M&M willfully violated the automatic stay, that the Retail Installment Contract and Security Agreement was not an executory contract, and that M&M was properly denied its post-petition attempt to perfect its lien.

05-8089, <u>In re Johnson</u>

**BRISCOE,** Circuit Judge, concurring:

I concur, but write separately to clarify why, in my view, the district court did not commit clear error in finding that M&M willfully violated the automatic stay. In its "Order On Damages," the bankruptcy court found that "M&M had actual notice of the bankruptcy filing on May 13, 2004 when the Debtors' attorney [Ken McCartney] spoke with Keith Smith, a vice president of M&M, and requested M&M return the repossessed Chevy." App. at 53-54. This finding is amply supported by the testimony of Smith. Smith testified that in mid-May 2004, McCartney contacted him by telephone. Id. at 170. Smith further testified that "McCartney said that he was counsel for the Johnsons and that they were in bankruptcy," and that McCartney "suggest[ed] that [M&M] . . . return the truck immediately to the Johnsons at their address." Id. at 171. In short, Smith acknowledged that he was advised that (a) the Johnsons had filed for bankruptcy, (b) were represented by counsel, and (c) that M&M had a legal obligation under the Bankruptcy Code to return the truck to the Johnsons.

According to the record, Smith chose not to believe McCartney for two reasons. First, Smith testified he was aware "that the Johnsons had prior been in bankruptcy and [he] felt that it was too quick for them to be in a bankruptcy" again. Id. In other words, Smith, despite being a non-lawyer, reached a legal conclusion that the Johnsons were ineligible to file for bankruptcy in May of 2004. Second, Smith testified that his "guard went up" due to McCartney's rude

and gruff demeanor. Id. According to Smith, when he began questioning McCartney about the information he had provided, McCartney's "voice got louder" and McCartney became upset. Id. Smith also noted that McCartney "did not offer to fax [him] a notice that [the Johnsons] were in bankruptcy or anything of the meeting." Id.

The bankruptcy court concluded, in assessing this testimony, that, even assuming McCartney was "rude and gruff" as asserted by Smith, "M&M had a responsibility to investigate further if it seemed Mr. McCartney [the Johnsons' attorney] was making false representations . . . ." Id. at 54. In my view, this conclusion is entirely reasonable. To the extent that Smith questioned McCartney's veracity, either due to McCartney's demeanor or to Smith's own faulty legal reasoning, Smith could and should have taken reasonable steps to investigate Smith's assertions.

In taking issue with the district court's finding and related conclusion, the concurring/dissenting opinion suggests that Smith in fact attempted to make further inquiry "by asking counsel to fax him the cover sheet of the Johnsons' bankruptcy petition," but that Smith's request "was rebuffed . . . ." Conc. at 4. Importantly, however, the bankruptcy court made no such finding. Moreover, Smith's own testimony on this point, which amounts to a single sentence, is ambiguous: "Nor did he [McCartney] offer to fax me any proof and when I challenged him on that, he got extremely upset." App. at 171. Because it is well-

established that it is not the function of an appellate court "to decide factual issues *de novo*," <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 395 U.S. 100, 123 (1969), it would be improper for us to find that Smith asked McCartney to fax him the cover sheet of the bankruptcy petition, or that McCartney refused to do so.

No. 05-8089, <u>Johnson v. Smith (In re Johnson)</u>

**KELLY**, Circuit Judge, concurring in part and dissenting in part:

I join the majority of the court's opinion, but I respectfully dissent from its conclusion that M&M willfully violated the automatic stay by failing to return the Chevy pickup after receiving a telephone call from the Johnsons' attorney.

To prove a violation of the automatic stay, the Johnsons "bear[] the burden of establishing, by a preponderance of the evidence, that [M&M] knew of the automatic stay and intended the actions that constituted the violation." Ct. Op. at 15. M&M cannot have wilfully violated the stay unless it had actual notice of it. See <u>id.</u> at 15-16. "Notice is regarded as actual where the person charged with notice either knows the particular facts in question or is conscious of having the means to know them, even though such means have not been used. . . . Actual notice embraces those things that reasonably diligent inquiry and exercise of the means of information at hand would disclose." 58 Am. Jur. 2d <u>Notice</u> § 4 (2002).

The dispute in this case arises from two nearly simultaneous events: the Johnsons filed for bankruptcy on May 6, 2004, and M&M repossessed the Chevy pickup on either May 10 or May 13. Aplt. App. at 63. The bankruptcy court found–and the parties do not dispute–that M&M had not received notice of the bankruptcy stay at the time that it repossessed the pickup. <u>Id.</u> The court further found that Mr. Smith, the Vice President of M&M, "took a May 13, 2004 telephone call from the Debtors' counsel requesting a turnover of the Chevy." <u>Id.</u>

Crucially, the court credited Mr. Smith's testimony that "[b]ecause of counsel's demeanor, Mr. Smith was suspicious that the Debtors were simply attempting to get the Chevy back improperly." Id. It likewise credited Mr. Smith's assertion that he refused to return the pickup because of these suspicions. Id.

Specifically, Mr. Smith testified that he frequently dealt with customers' bankruptcies as part of his job responsibilities. Id. at 174. Therefore, he was accustomed to speaking with bankruptcy attorneys, and he was familiar with the court-provided notice sent to creditors in conjunction with the filing of a bankruptcy petition. Id. at 170-71. However, Mr. Smith did not know the Johnsons' counsel, and he testified that he harbored serious doubts about the truth of counsel's assertions because "it wasn't [like] any phone call I've ever taken in my professional career in regards to bankruptcy matters. Certainly from an attorney." Id. at 172. He further testified: "[i]n a very abrupt and harsh manner [counsel] explained that we better get our act together and return the vehicle, at which time I started questioning him and he just got downright irate with me so that was the end of the phone call." Id. at 242. Notably, Mr. Smith explained that counsel "did not offer to fax me a notice that they were in bankruptcy or anything . . . and when I challenged him on that, he got extremely upset." Id. at 171. The call ended when counsel hung up on Mr. Smith. Id. at 243.

Following the incident, Mr. Smith "sat there and shook [his] head and thought something wasn't right." Id. In his experience, "more often everyone is

very honorable, but sometimes you come across those that know the system and know how to get around things and therefore you have to have your guard up to protect the interest of your company." Id. at 172-73. Therefore, he explained, "[i]t's not as if you would assume that when someone represents that they're an attorney that they're liars because you try not to, but unfortunately, when a volatile situation like a repossession occurs, naturally you're going to put up the safeguards and the safeguards indicated this isn't normally how I speak to an attorney." Id. at 242-43. Indeed, Mr. Smith recalled that he had such doubts about the validity of the call that he spoke to several colleagues to "sound it off to them because I was just in pure shock that I had a conversation [of] this nature with this gentleman." Id. at 243.

Mr. Smith's testimony at two hearings–one to determine whether M&M willfully violated the stay and the other to determine damages–is the only evidence in the record describing the telephone call he received from counsel. This testimony was consistent and uncontradicted, and it paints a clear picture of a well-intentioned businessman confronted with an unsubstantiated demand from an unknown caller that he relinquish property worth $13,000. The actual notice standard requires the person receiving notice to be left free of reasonable concerns about the validity of the communication purporting to give him notice.[1]

---

[1] Although a telephone call can provide actual notice, see, e.g., Rowe v.
(continued...)

Given the bankruptcy court's uncontested finding that "[b]ecause of counsel's demeanor, Mr. Smith was suspicious that the Debtors were simply attempting to get the Chevy back improperly," id. at 63, it is clear that the Johnsons did not carry their burden of proving a willful violation by a preponderance of the evidence. In other words, the bankruptcy court's finding that Mr. Smith acquired actual notice of the stay despite his honestly-held doubts about the validity of the call was clearly erroneous.

Even if the notice given here was sufficient to require Mr. Smith to make further inquiry, as the bankruptcy court concluded, see id. at 54, his attempt to do so by asking counsel to fax him the cover sheet of the Johnsons' bankruptcy petition was rebuffed, id. at 171. Inquiry notice must at least contain enough information to permit the creditor to verify that a petition has been filed. Here, the unknown caller did not give Mr. Smith any information suggesting when or where the petition was filed. Mr. Smith certainly cannot be expected to call each of the 91 United States bankruptcy courts to ask whether they had any recent bankruptcy filings by debtors named "Johnson."

The court dismisses this concern because "M&M is a sophisticated car

---

[1](...continued)
Steinberg, 253 B.R. 524, 528 (E.D. Mich. 2000); In re Flack, 239 B.R. 155, 164 (Bankr. S.D. Ohio 1999), especially when it is accompanied by documentary confirmation, see, e.g., Fleet Mortgage Group, Inc. v. Kaneb, 196 F.3d 265, 267 (1st Cir. 1999); Flack, 239 B.R. at 164, actual notice must always be reasonable on the facts of the case, Flack, 239 B.R. at 164.

dealership represented by counsel and admittedly quite familiar with repossession and bankruptcy." Ct. Op. at 18-19. Ironically, however, M&M's sophistication and familiarity with bankruptcy is what caused it to become suspicious in the first place. M&M was accustomed to receiving bankruptcy notices, but it had not received one in this case. M&M was accustomed to dealing with bankruptcy attorneys, but Mr. Smith testified that the call here was unlike any other he had received in his professional career. Of course, M&M's experience also taught it that dishonest debtors sometimes seek to fight repossession by ruse. If anything, therefore, M&M's sophistication and bankruptcy experience made Mr. Smith's doubts about the validity of the unknown caller's assertions even more reasonable than they otherwise would have been.

Although the court recognizes the validity of these doubts, id. at 5, it holds that Mr. Smith acquired actual notice of the Johnsons' pending bankruptcy. This holding excuses debtors from their filing obligations while placing creditors with reasonable doubts about the validity of notice in an untenable position. If Congress intended creditors to trust an unknown caller representing that a bankruptcy petition had been filed, it would have spared courts the time and effort of serving creditors. Instead, the law recognizes that reasonable creditors will want concrete evidence of the pendency of a bankruptcy before relinquishing their rights against the debtor; this is why notice of a bankruptcy is supposed to come directly from the court. See Fed. R. Bankr. P. 2002(a). Even in a case like this,

where service failed due to a mistake, counsel could easily have provided actual notice by faxing M&M a copy of the petition, see Fleet, 196 F.3d at 267; Flack, 239 B.R. at 164, bringing the petition to M&M and speaking with Mr. Smith in person, see In re Dunning, 269 B.R. 357, 368 (Bankr. N.D. Ohio 2001) ("[T]he bank received actual notice of [the bankruptcy] filing because [the debtor] took [his petition] to the Bank and showed it to the two named individuals who were employed by the bank."), or simply providing a case number to M&M's attorney, see In re Smith, 180 B.R. 311, 318 (Bankr. N.D. Ga. 1995) ("[A] case number . . . is essential in order to provide actual notice of a pending bankruptcy case."). Counsel's failure to take one of these simple steps, especially in light of Mr. Smith's request for documentation, see Aplt. App. at 171, justified M&M's suspicion that the call was not genuine.

Accordingly, I would hold that M&M's violation of the stay between the time it received the telephone call on May 13, 2004, and the time that it returned possession of the truck to the Johnsons on May 28, 2004, was not willful. The bankruptcy court's order may be read as finding a separate willful violation of the stay when M&M noted a lien on the title transfer documents. See Aplt. App. at 54-56. I have no quarrel with the bankruptcy court's findings on this issue, and I join the court in affirming them.