**In re Tarran M. SPINNER, Debtor.**

**Tarran M. Spinner, Plaintiff,**

v.

**Cash In A Hurry, LLC, Defendant.**

**Bankruptcy No. 06–71767–MGD.**

**Adversary No. 06–6415–MGD.**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Sept. 29, 2008.

Ralph Goldberg, Goldberg & Cuvillier, P.C., Decatur, GA, for Plaintiff, Tarran M. Spinner.

Wade G. Anderson, Macon, GA, Richard E. Thomasson, Thomasson Law Firm, LLC, Atlanta, GA, for Defendant, Cash In A Hurry, LLC.

### MEMORANDUM OPINION

MARY GRACE DIEHL, Bankruptcy Judge.

Tarran M. Spinner ("Debtor") filed the above-styled adversary proceeding against Cash In A Hurry, LLC ("Defendant"), and a trial on the matter was held on June 3, 2008. Debtor alleges a Truth In Lending Act ("TILA") violation by Defendant and seeks statutory damages. In addition, Debtor seeks damages for the sale of Debtor's vehicle, a 1997 BMW 528i, as an alleged willful violation of the automatic stay under 11 U.S.C. § 362(k), or, alternatively, recovery for an alleged fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1).

The Court has jurisdiction pursuant to 28 U.S.C. § 1334, and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). This memorandum opinion constitutes findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52(a), applicable to this proceeding pursuant to FED. R. BANKR.P. 7052.

### FINDINGS OF FACT

On January 23, 2006, Defendant and Debtor entered into a title pawn loan transaction ("pawn transaction"). (Plaintiff's Exhibit 1). Defendant regularly extends credit for personal, family, and household purposes for which a finance charge is imposed. This pawn transaction was for personal purposes. Debtor gave Defendant a title lien on her vehicle, a 1997 BMW 528i, in exchange for $2,078.00 in cash.[1] (Plaintiff's Exhibits 1 & 2). The terms of the pawn transaction included an initial $519.50 finance charge and an annual percentage rate ("APR") of 304.24%. The $519.50 finance charge is 25% of the $2,078.00 loan amount. The maturity date on the loan was February 22, 2006, a term of thirty days. Debtor has the option to redeem, which means all amounts owing are paid by the maturity date. Alterna-

---

1. Mr. Friedman, manager of Defendant, testified that Statewide Financial Services "held liens" for Defendant. Statewide Financial Services is listed as the lienholder on the title. (Plaintiff's Exhibit 2).

tively, the parties can consent to an extension of the pawn transaction for additional thirty-day periods. A thirty-day grace period follows the maturity date and allowed Debtor to redeem the vehicle during that period. Upon expiration of the grace period, Debtor's property would become the pawnbroker's property.

The APR after the second thirty-day extension was contracted to be reduced to 152.12%. This reduced APR would be applicable to any extension beyond 90 days after the initial pawn transaction date. The contract noted applicable fees for title registration, vehicle storage, and repossession.

This pawn transaction was extended six times (Plaintiff's Exhibit 3).

- First Extension: Debtor's first payment on February 22, 2006 of $919.50 was first applied to the finance charge, and then the principal amount was reduced to $1,678.00. On February 22, 2006, the contract was extended and Debtor incurred an additional interest or "roll over" charge for the extension in the amount of $419.50, which represents 25% of the unpaid principal amount. The maturity date for the extended contract was now March 24, 2006.

- Second Extension: On March 30, 2006, Debtor paid $500.00 on her account. This payment was applied to the roll over charge and reduced the principal on the loan by $80.50. The principal balance on the loan after Debtor's March 30, 2006 payment was $1,597.50. The contract was extended, and a roll over charge in the amount of $399.38, which amounts to 25% of the March 30, 2006 principal balance. The maturity date for the extended contract was now April 23, 2006.

- Third Extension: Debtor made a $399.38 payment on April 28, 2006. This payment paid off the interest in total, but the principal balance on the loan remained at $1,597.50. The contract was extended and a $399.38 roll over charge was added to Debtor's loan. The maturity date on the extended contract was now May 23, 2006.

- Fourth Extension: Debtor made two payments totaling $399.38 on June 7, 2006 and June 9, 2006. These payments covered interest charges, but the principal amount of the loan remained at $1,597.50. The contract was extended on June 9, 2006 and a roll-over charge in the amount of $399.38 was added to Debtor's balance. The maturity date on the extended contract was June 22, 2006.

- Fifth Extension: Debtor made two payments totaling $399.38 on July 13, 2006 and July 20, 2006. These payments covered interest charges, but the principal amount of the loan remained at $1,597.50. The contract was extended on July 13, 2006 and a roll-over charge in the amount of $399.38 was added to Debtor's balance. The maturity date on the extended contract was July 22, 2006.

- Sixth Extension: Debtor made two payments totaling $399.38 on August 4, 2006 and August 18, 2006. These payments covered interest charges, but the principal amount of the loan remained at $1,597.50. The contract was extended on August 20, 2006 and a roll-over charge in the amount of $399.38 was added to Debtor's balance. The maturity date on the extended contract was August 21, 2006.

Debtor's payments totaled $3,017.02 prior to the repossession of her vehicle. The amount still owing on the account totaled $1,996.88, including $1,597.50 in principal and $399.38 in fees. The grace period on the contract ran from August 21, 2006 to September 20, 2006.

Debtor testified that her car was repossessed at approximately 2:00 a.m. on September 22, 2006. Debtor and Debtor's counsel testified that they each called Defendant's manager, Mr. Friedman, on September 22, 2006 requesting the return of Debtor's vehicle. Debtor filed a Chapter 13 petition at 6:00 p.m. on September 22, 2006. Debtor testified that she called Defendant's office at 8:00 a.m. and later went into the office on September 22, 2006 looking for Mr. Friedman. She testified that she was never told the car was sold. Debtor's counsel testified that he called Mr. Friedman that evening and Mr. Friedman refused to return the vehicle. Debtor's counsel also stated that Mr. Friedman did not indicate that the vehicle had been sold. Mr. Friedman testified that Defendant had no sale records of the vehicle and none were produced as part of Debtor's discovery request. (Plaintiff's Exhibit 4).

Mr. Friedman initially testified that he did not recall speaking with Debtor's counsel on September 22, 2006. Debtor's counsel refreshed his recollection with Plaintiff's Exhibit 6, and Mr. Friedman testified that the vehicle was sold prior to Debtor's counsel's telephone call and before the receipt of Debtor's counsel's letter requesting turnover of the vehicle (Plaintiff's Exhibit 6).

Mr. Friedman testified that he did not know the sale amount of Debtor's vehicle. He recalled that the vehicle was sold with approximately four other cars to Raymond Kunata in Naples, Florida. There is no contract of sale for the vehicles. Mr. Friedman was paid by check for the vehi-

cles. There is no copy of the check. Mr. Friedman has no record of the amount of the sale or the time of the sale. Mr. Friedman testified that he routinely sells cars to Mr. Kunata by oral contract, and no written contract for the sale of Debtor's vehicle existed. Plaintiff's Exhibit 3, the Title Loan History, includes a line item dated September 22, 2006 that states "Write Off." Mr. Friedman explains that the "Write Off" computer entry is typically entered after a vehicle is sold. No evidence was provided as to what time of day the "Write Off" entry was entered.

The Court heard testimony as to the value of Debtor's vehicle from Debtor, Phillip Elvitt, a former new and used car salesman, and Mr. Friedman. Debtor testified that she purchased the 1997 BMW for $7,000.00 in October of 2005. Debtor stated the car was in excellent condition with many features, including a leather interior, sunroof, and tinted windows. When Debtor purchased the vehicle it had 132,000 miles on it. She paid $3,000.00 for a new transmission six weeks after her purchase. She testified that the original purchase price was low when compared to similar cars on popular used car websites such as CarMax. Debtor testified that the vehicle at the time of purchase was worth between $12,000.00 to $15,000.00. She believed that she got a lower price because she bought the vehicle from a co-worker who wanted to help her.

Debtor also testified on cross examination that she borrowed money from Georgia Telco Credit Union for the purchase of the 1997 BMW in the amount of $7,000.00. Debtor consented to a judgment against her for $5,566.21 in a nondischargeability adversary proceeding brought by Georgia Telco Credit Union, Adversary Proceeding No. 06–6569, entered November 29, 2006.

Mr. Elvitt was certified as an expert for the retail sale of new and used cars, and

valued the Debtor's vehicle at the time of trial to be between $8,500.00 to $9,000.00. Mr. Elvitt never saw Debtor's car and his assessment was based upon facts relayed to him by Debtor or Debtor's counsel. His valuation was based on the excellent condition of the car, the addition of a new transmission, a comparable car analysis on a popular used car website, AutoTrader, and reference to Edmunds. Mr. Elvitt testified that the vehicle would have had to be involved in a major accident for the $2,500.00 to $3,500.00 valuation by Defendant to be accurate. On cross examination, Mr. Elvitt stated that he had no experience in the used car wholesale industry.

Debtor also testified that personal property in the vehicle was not returned to her. A new camera, three to four lawn chairs, cell phone attachments, and her son's sports equipment, jerseys, and shoes were in the car. Debtor's counsel's demand letter to Defendant on September 22, 2006 did not mention any personal property. (Plaintiff's Exhibit 6). Debtor's testimony valued her personal property in the vehicle at approximately $500.00.

Debtor also testified that the repossession and loss of her car · impacted her ability to work for one month. She stated that she was sick, couldn't eat, and didn't want to face her co-workers. Debtor testified that she was "really crushed" and had invested a lot into that car. Debtor was able to resume her normal work schedule within one month of the repossession.

## CONCLUSIONS OF LAW

■ Several legal issues are before the Court and will be taken in sequence. First, the Court must determine whether Defendant's Motor Vehicle Pawn Contract, admitted into evidence as Plaintiff's Exhibit 1, violated TILA under 15 U.S.C. § 1632(a) and its implementing regulation 12 C.F.R. § 226.17(a)(2). Second, the Court must assess whether the vehicle was property of the bankruptcy estate. The outcome of this determination will determine whether the Court will assess whether the sale violated the applicable automatic stay under § 362, or whether Debtor's alleged forfeiture of interest in her vehicle under the Georgia Pawnshop Act constitutes a fraudulent transfer pursuant to § 548(a)(1).

■ As a preliminary matter, TILA applies to pawn transactions. TILA was enacted to ensure meaningful disclosure of credit terms to best allow a customer to make an informed credit decision. 15 U.S.C. § 1601(a); *see also Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 559, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980). Pawn transactions are an extension of credit. *Barlow v. Evans*, 992 F.Supp. 1299, 1304 (M.D.Ala.1997) (holding that pawn transactions are extensions of credit, not sales). Generally, TILA applies to an individual or business that extends credit when the following four conditions are satisfied: (1) the credit is extended to customers; (2) the extension of credit is done regularly; (3) the credit is subject to a finance charge or payable by more than four installments as provided by a written agreement; and (4) the credit is primarily for personal, family, or household purposes. *See* 12 C.F.R. § 226.1(c)(1). The evidence from trial clearly established that these four conditions were fulfilled by Defendant; therefore, TILA applies to this pawn transaction. *See Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir.1993) (holding that a transaction between pawn shop and consumer represented loans subject to TILA); *Fryer v. Easy Money Title Pawn, Inc. (In re Fryer)*, 183 B.R. 322, 327 (Bankr.S.D.Ga.1995) (holding that a TILA violation in a pawn transaction re-

sulted in the imposition of statutory damages).

### I. Defendant violated TILA by failing to provide the annual percentage rate in a more conspicuous manner than other terms on Debtor's Motor Vehicle Pawn Contract.

■ TILA requires a creditor to make certain disclosures to customers before they become obligated on a contract. Regulation Z, 12 C.F.R. § 226.17, sets forth specific content and time requirements of such disclosures. Section 1638(a) sets forth specific disclosures that creditors must make in closed-end transactions. Among other items, creditors must disclose the annual percentage rate of interest and finance charge. 15 U.S.C. §§ 1638(a)(3), (4). Section 1632(a) imposes an extra obligation to disclose the annual percentage rate and finance charge more conspicuously than other terms, data, or information provided in connection with a transaction. 12 C.F.R. § 226.17(a)(2) implements the requirements in 15 U.S.C. § 1632(a) and provides in pertinent part: "The terms finance charge and annual percentage rate ... shall be more conspicuous than any other disclosure, except the creditor's identity." 12 C.F.R. § 226.17(a)(1), (2).

Here, the Motor Vehicle Pawn Contract as provided to Debtor by Defendant, admitted into evidence as Plaintiff's Exhibit 1, consisted of a yellow carbon copy on paper slightly thicker than tissue paper. Four key terms, including the APR are included in a boxed area about one third from the top of the page. The terms are in all caps and in a font size equal to the largest on the page. Double dashes, similar to an equal sign, surround the APR and finance charge. The remaining two terms, amount financed and total of payments are surrounded by a single lined

boxed area. The carbon copy form makes it impossible to decipher whether any or all of the boxed terms are bolded. Additionally, the Motor Vehicle Pawn Contract includes handwritten marks around the amounts of the finance charge, the amount financed, and the total of payments. A handwritten note and arrow from the total of payments amount states in all printed caps, "COMPLETE PAYOFF PROVIDED THAT BY OR BEFORE DUE DATE" in the right hand margin of the single page contract.

Below the boxed four terms mentioned above, the following statement appears centered on the page in all capital letters in a font size equal to the APR, "YOUR PAYMENT SCHEDULE WILL BE." Directly under this centered sentence is, "Pay $2,597.50 on 2/22/06" in a similar font size but not all capitalized. The due date has identical handwritten marks on three sides of the date and a handwritten arrow follows the date. Following the handwritten arrow, "DUE DATE" appears in all capital, handwritten letters in a comparable font size to the typed date. The marked date, arrow, and handwritten words, DUE DATE, are highlighted by an orange mark.

■ Conspicuous is defined as "a question of law under TILA that, like clarity, is governed by an objective, reasonable person approach." *Smith v. Check–N–Go of Ill., Inc.,* 200 F.3d 511, 514–17 (7th Cir.1999). Creditors must strictly comply with TILA's requirements. *Rodash v. AIB Mortgage Co.,* 16 F.3d 1142, 1144 (11th Cir.1994). As such, the Motor Vehicle Pawn Contract fails to comply with § 1632(a) and § 226.17(a)(2) because it does not make the APR more conspicuous than other terms.

The Eleventh Circuit in *Shroder v. Suburban Coastal Corp.,* held that the APR was not sufficiently conspicuous when it,

along with several other terms were capitalized and italicized, because it was not more conspicuous than other terms as the regulation requires. *Shroder v. Suburban Coastal Corp,* 729 F.2d 1371 (11th Cir. 1984). Additionally, the Eleventh Circuit imposed statutory damages for the violation as provided by the Act, explaining that a "clear violation" had occurred according to the statutory requirements. *Id.* In *Malfa v. Household Bank, F.S.B.,* the court held that no § 1632(a) TILA violation occurred where the APR and finance charge had the same font size and style as other terms because these terms also had boxes around them to make them sufficiently conspicuous. *Malfa v. Household Bank, F.S.B.,* 825 F.Supp. 1018 (S.D.Fla. 1993). The *Malfa* court distinguished the Eleventh Circuit's analysis in *Shroder* by stating that factors other than the font and typestyle lead to the violation and damages determination. *Id.*

Here, the original contract form seems to contemplate the "more conspicuous" requirements of § 1632(a) because the APR and finance charge are the only terms on the page surrounded by double dashes. However, Debtor testified that all handwriting, markings, and highlighted areas were present when she signed the Motor Vehicle Pawn Contract. The highlighted printed date, arrow, and handwritten, all capitals "DUE DATE" is the most conspicuous term on the page. This phrase is not only highlighted but also included in a boxed area with other smaller text. The handwritten markings on three of the four terms, finance charge, amount financed, and total of payments emphasizes those amounts and terms more than the APR. The handwritten note to the right of the total of payments term also emphasizes that term. The APR is the only one of the four boxed terms to have no handwritten mark on it. The Motor Vehicle Pawn Contract as submitted into evidence does not provide the APR in a more conspicuous manner than other contract terms.

■ "[L]iability flows from even minute deviations from the requirements of the [TILA] statute and of Regulation Z." *Barlow v. Evans,* 992 F.Supp 1299, 1307 (M.D.Ala.1997). A single violation of TILA generates liability. *Jackson v. Columbus Dodge, Inc.,* 676 F.2d 120 (5th Cir.1982). Accordingly, Debtor is entitled to a judgment on the issue of liability.

Section 1640(a)(2)(A)(i) provides that statutory damages are twice the financing charge but limited to $1,000.00 for an individual consumer for statutory violations. Here, the initial finance charge is $519.50. Therefore, the applicable statutory damages awarded to Debtor are $1,000.00.

## II. Debtor's vehicle is property of the bankruptcy estate.

■ Section 541(a)(1) describes property of the estate as "all legal or equitable interests of debtor in property as of the commencement of the case." A debtor's interest in property is determined in accordance with state law. *Butner v. U.S.,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Defendant argues that Debtor's right in the vehicle was automatically forfeited at the close of the thirty-day grace period, on September 20, 2006, in accord with the Georgia Pawnshop Act at O.C.G.A. § 44–14–403. Debtor argues that the protections offered by the Georgia Pawnshop Act should not apply to Defendant based on its failure to comply with all the statutory requirements at O.C.G.A. §§ 44–12–130 and 44–12–131.

O.C.G.A. § 44–12–130(3) defines a pawn transaction as "any loan on the security of pledged goods or any purchase of pledged goods on the condition that the pledged goods may be redeemed or repurchased by the pledgor or seller for a fixed price

within a fixed period of time". Georgia law explicitly provides for vehicle title pawn transactions, and a pledge of a vehicle only requires the pawnbroker's possession of the vehicle on the certificate of title. O.C.G.A. § 44–12–130(5). Plaintiff's Exhibit 2 evidences Debtor as pledgor of her vehicle to Defendant.

The contractual terms of a vehicle pawn transaction are provided for under Georgia law. O.C.G.A. § 44–12–131. A pawn transaction must be for a thirty-day period with continuations of additional thirty-day periods. O.C.G.A. § 44–12–131(a)(1); *see also* O.C.G.A. § 44–14–403(4) (pawn transactions are considered extended unless three conditions are met). Interest rates for vehicle pawn transactions are limited to 25% of the principal advanced for each thirty-day period for the first ninety days of a transaction. O.C.G.A. § 44–12–131(a)(4)(A). Beyond the first ninety-day period, interest rates are limited to 12.5% of the principal amount advanced. O.C.G.A. § 44–12–131(a)(4)(B). Motor vehicle pawn transactions also have maximum fee amounts provided by statute. O.C.G.A. § 44–12–131(a)(4)(C). "A fee equal to no more than any fee imposed by the appropriate state to register a lien." O.C.G.A. § 44–12–131(a)(4)(C)(i). In Georgia, the lien registration fee is $18.00.

■ Although there are additional pawnbroker or pawn transaction requirements under the Georgia Pawnshop Act, violations of interest rates caps result in a void transaction. "Any interest, charge, or fees contracted for or received . . . in excess of the amounts permitted under section (a) of this Code section shall be uncollectible and the pawn transaction shall be void." O.C.G.A. § 44–12–131(b).

Pawnbrokers are also required to maintain business records under O.C.G.A. § 44–12–137(a)(5) (violation of this requirement is a misdemeanor). The contractual grace period is also provided by statute. O.C.G.A. § 44–14–403(b)(1). Pledged goods not redeemed by the end of the grace period are automatically forfeited by operation of law to the pawnbroker and "all ownership interest by the pledgor is extinguished." O.C.G.A. § 44–14–403(b)(3).

Defendant asserts that Debtor's grace period was expired and Debtor automatically forfeited her ownership interest in the vehicle before the filing of her Chapter 13 bankruptcy petition on September 22, 2006. Debtor argues that the vehicle was property of the estate because Defendant's failure to comply with the Georgia Pawnshop Act requirements should not provide the benefit of an automatic forfeiture of Debtor's vehicle to Defendant.

The vehicle was property of the bankruptcy estate for the reasons set forth below. While the Court is troubled by Defendant's failure to maintain business records in connection with the sale of Debtor's vehicle and the excessive title fee registration fee charged by Defendant, a closer review of the Title Loan History reveals a more alarming violation of the Georgia Pawnshop Act. Defendant assessed excessive interest rates over the course of the contract. *See* Plaintiff's Exhibit 3 & 4. According to the Georgia Pawnshop Act, a pawn transaction is voided because interest rates assessed after the first ninety-day period were in excess of the 12.5% maximum provided by O.C.G.A. § 44–12–131(a)(4)(B). O.C.G.A. § 44–12–131(b). Mr. Friedman's testimony established that Debtor's contract was extended multiple times. The original loan occurred on January 23, 2006. Ninety days after January 23, 2006 is April 23, 2006. Interest rates assessed after April 23, 2006 remained to be charged at 25% of the outstanding principal amount, or $399.38. Debtor's subsequent payments in

June, July, and August extended the contract in respective thirty-day periods, and the corresponding roll over charges continued to be assessed at 25%, instead of the statutory maximum of 12.5% of the outstanding principal amount.

■ If the contractual requirements of the Georgia Pawnshop Act are not "strictly complied with, Defendant should not receive favored treatment that pawnbrokers typically receive under the Act." *Johnson v. Speedee Cash of Columbus, Inc.,* 289 B.R. 251, 253 (Bankr.M.D.Ga.2002) (voiding the pawn transaction based on pawnbrokers failure to comply with the statutory grace period provided by the Act). A pawn transaction is rendered void when a pawnbroker charges excess interest rates. O.C.G.A. § 44–12–131(b); *Hooks v. Cobb Ctr. Pawn & Jewelry Brokers,* 241 Ga.App. 305, 307, 527 S.E.2d 566 (Ga.Ct.App.1999). Defendant's excessive interest rate charges void the pawnshop transaction. Without the benefit of the Georgia Pawnshop Act's automatic forfeiture, 11 U.S.C. § 541(a)(1)'s description of property of the estate would include the Debtor's vehicle because Debtor held a legal interest in the vehicle at the commencement of the case. The vehicle was titled in Debtor's name with Defendant holding a security interest. (Plaintiff's Exhibit 2).

## A. Defendant's sale of Debtor's vehicle constitutes a willful violation of the automatic stay.

Section 362(a) provides protection of the automatic stay against the debtor or property of the estate. Automatic stay protection coincides with the commencement of the debtor's bankruptcy petition. Because the pawn transaction is void, the next question before the Court is whether Defendant sold Debtor's vehicle prior to the commencement of her bankruptcy filing. The timing of the sale of the vehicle in relation to Debtor's bankruptcy filing is critical to the question of whether Defendant's sale of Debtor's vehicle constituted a willful violation of the automatic stay pursuant to 11 U.S.C. § 362(k)(1). Until the bankruptcy petition is filed, there is no automatic stay protection.

■ A willful violation does not require a specific intent to violate the automatic stay. The standard for a willful violation of the automatic stay under § 362(k) is met if there is knowledge of the stay and the defendant intended the actions which constitute the violation. *Fleet Mortgage Group, Inc. v. Kaneb,* 196 F.3d 265, 269 (1st Cir.1999) (explaining that any intentional act is willful with knowledge of the stay); *Goichman v. Bloom (In re Bloom),* 875 F.2d 224, 227 (9th Cir.1989); *see also Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.),* 902 F.2d 1098, 1105 (2d Cir.1990); *Cuffee v. Atlantic Bus. and Community Dev. Corp. (In re Atlantic Business and Community Corp.),* 901 F.2d 325, 329 (3d Cir.1990). In cases where the creditor received actual notice of the automatic stay, courts must presume that the violation was deliberate. *See Homer Nat'l Bank v. Namie,* 96 B.R. 652, 654 (W.D.La. 1989). The debtor has the burden of providing the creditor with actual notice. Where a party has actual knowledge of the bankruptcy, and despite such knowledge intentionally undertakes actions that in fact violate the stay, the party's ignorance of the legal effect of the stay is no defense. *In re Manuel,* 212 B.R. 517 (Bankr. E.D.Va.1997); *In re Peterkin,* 102 B.R. 50, 53–54 (Bankr.E.D.N.C.1989).

■ Debtor must establish by preponderance of the evidence[2] that Defen-

---

**2.** The Court is aware that some courts apply a clear and convincing evidence standard for

dant willfully violated the automatic stay under § 362(k). *E.g., In re Johnson*, 501 F.3d 1163, 1171 (10th Cir.2007); *see also Heghmann v. Indorf (In re Heghmann)*, 316 B.R. 395, 404–05 (1st Cir. BAP 2004). The debtor has the burden of providing the creditor with actual notice. Once the creditor receives actual notice, the burden shifts to the creditor to prevent violations of the automatic stay. *See Mitchell Const. Co., Inc. v. Smith (In re Smith)*, 180 B.R. 311, 319 (Bankr.N.D.Ga.1995).

■ Applying this standard to the facts, the evidence produced at trial was sufficient to establish that Defendant sold the car post-petition. Trial testimony revealed that both Debtor's counsel and Debtor called Defendant's office; Debtor's counsel spoke to Mr. Friedman on the phone in the evening of September 22, 2006; and Debtor's counsel wrote a letter delivered by facsimile and mail demanding turnover of Debtor's vehicle on September 22, 2006. Mr. Friedman or other employees of the Defendant never stated that the car was sold on September 22, 2006. Defendant produced no evidence to refute that the sale of the vehicle occurred after Debtor's bankruptcy petition. Instead, Mr. Friedman's testimony included that there were no business records as to the time and date of sale of Debtor's vehicle. Only when Debtor's counsel refreshed Mr. Friedman's recollection with Plaintiff's Exhibit 6, a demand letter for turnover of the vehicle, did Mr. Friedman aver that the vehicle was sold prior to his receipt of the letter. The trial testimony and evidence

taken together establishes by preponderance of the evidence that the vehicle was sold post petition.

■ Mr. Friedman's testimony also made clear that Defendant made decisions to repossess and sell the vehicle based on the assumption that it owned Debtor's vehicle by operation of law pursuant to the Georgia Pawnshop Act. Defendant's inaccurate legal conclusion has no impact on a finding of a willful stay violation. *In re Manuel*, 212 B.R. 517 (Bankr.E.D.Va. 1997); *In re Peterkin*, 102 B.R. 50, 53–54 (Bankr.E.D.N.C.1989). The evidence establishes that Defendant repossessed Debtor's car and intentionally sold the vehicle. Section 362(k) does not require a specific intent requirement, only that Defendant carried out an intentional act with knowledge of the automatic stay. *Fleet Mortgage Group, Inc. v. Kaneb*, 196 F.3d 265, 269 (1st Cir.1999). In weighing the credibility of the trial testimony regarding the sale of Debtor's vehicle by Mr. Friedman, Mr. Goldberg, counsel for Debtor, and Debtor, the Court determines that Defendant had knowledge of the bankruptcy petition and the accompanying automatic stay protections from his conversations with Debtor's counsel prior to the sale of the vehicle. Further, because Defendant failed to produce any sale or business record with the time and date of the sale, Debtor shall not be charged with carrying the burden of proof as to the time of sale. *E.g., Allstate Fin. Corp. v. Zimmerman*, 330 F.2d 740, 744 (5th Cir.1964) ("Where

willful stay violations. *E.g., Bolen v. Mercedes Benz, Inc. (In re Bolen)*, 295 B.R. 803, 807 (Bankr.D.S.C.2002). However, since the Supreme Court of the United State's decision in *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), the vast majority of courts addressing this issue have elected to apply the preponderance of the evidence standard. *In re Johnson*, 501 F.3d 1163, 1171 n. 5 (10th Cir.2007). Many courts use the

following quote from *Grogan v. Garner* to support their conclusion: "Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.' " *Id.* at 1171 (quoting *Grogan v. Garner*, 498 U.S. at 286, 111 S.Ct. 654).

the burden of proof of a negative fact normally rests on one party, but the other party has peculiar knowledge or control of the evidence as to such matter, the burden rests on the latter to produce such evidence, and failing, the negative will be presumed to have been established.").

■ A willful violation of the stay allows for the recovery of "actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." § 362(k)(1). Debtor's actual damages require a determination of the value of the repossessed vehicle. Debtor seeks $14,000.00 in actual damages and estimated the value of the car at $12,000 to $15,000 at the time of its purchase. Defendant states that its loan provided Debtor wholesale book value of the vehicle at $2,078.00. Debtor paid $7,000.00 for the vehicle and replaced the transmission in the vehicle before it was repossessed. Debtor's expert, Mr. Elvitt, estimated the value of the vehicle as of the date of trial between $8,500 and $9,000. After reviewing the evidence and weighing the credibility of the testimony, the Court determines that the vehicle was valued at $7,500.00 at the time it was repossessed. This determination takes into account the purchase price of the car, Debtor's loan amount from Georgia Telco Credit Union for the purchase of the vehicle, and Debtor's cost to improve the vehicle with a new transmission.

Debtor's actual damages from the loss of her vehicle are reduced by the outstanding principal loan amount owed to Defendant. The Title Loan History reports that Debtor's outstanding principal amount on the loan is $1,597.50. However, Defendant's calculation includes excessive interest rate charges as explained in detail above. When interest rate charges are reduced to 12.5% after the initial ninety-day period of the contract and Debtor's payments are properly allocated to reduced interest payments and the principal balance, Debtor's payments in June, July, and August reduce the outstanding principal on the loan to $920.43. Therefore, Debtor's damages for the loss of her vehicle total $6,579.57.

An additional $300 for the loss of Debtor's personal property in the vehicle shall be included in Debtor's actual damages award.

■ Emotional distress damages may also be recovered as actual damages under § 362(k)(1). *In re Dawson,* 390 F.3d 1139, 1148 (9th Cir.2004); *Fleet Mortgage Grp., Inc. v. Kaneb,* 196 F.3d 265(1st Cir.1999); *In re Poole,* 242 B.R. 104, 112 (Bankr.N.D.Ga.1999). A "causal link between the willful conduct in violation of the stay and the harm must be clearly established or readily apparent" in order to award actual damages for emotional distress. *In re Bishop,* 296 B.R. 890, 897 (Bankr.S.D.Ga.2003) (citing *Burke v. Ga. Dept. of Rev. (In re Burke),* 285 B.R. 534, 536–37 (Bankr.S.D.Ga.2001)). Debtor's testimony established that she had trouble working for one month after the repossession and sale of her car. Her inability to be around co-workers, inability to eat, and complications with high blood pressure constitute a specific emotional impact causally linked to the loss of her vehicle. Debtor testified that she was able to resume her normal working schedule one month after the repossession and sale. As such, the Court shall award her one month's salary, according to Schedule I of her bankruptcy petition, in the amount of $2,356.70 for emotional distress damages associated with Defendant's willful violation of the automatic stay.

Reasonable attorney's fees will also be awarded to Debtor. Debtor's counsel is directed to submit an affidavit of the amount sought. Defendant shall have ten

days from Debtor's counsel's submission to contest the fee amount.

## B. There is no forfeiture of Debtor's ownership interest in her vehicle, and, therefore, no fraudulent transfer.

Debtor's alternative assertion to the vehicle being property of the bankruptcy estate is that the alleged forfeiture of her interest under the Georgia Pawnshop Act constituted a fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B). Section 548(a)(2) permits avoidance if the trustee can establish: (1) that the debtor had an interest in property; (2) that a transfer of that interest occurred within one year of the filing of the bankruptcy petition; (3) that the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) that the debtor received "less than a reasonably equivalent value in exchange for such transfer." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 114 S.Ct. 1757, 1760, 128 L.Ed.2d 556, *rh'g denied,* 512 U.S. 1247, 114 S.Ct. 2771, 129 L.Ed.2d 884 (1994). Because the pawn transaction is void, pursuant to O.C.G.A. § 44–12–131(b), there was no transfer of property from Debtor to Defendant. As such, there is no fraudulent transfer.

### CONCLUSION

For the reasons set forth above, judgment is entered in favor of Debtor. Defendant violated TILA with its Motor Vehicle Pawn Contract and Debtor is entitled to $1,000.00 in statutory damages. Defendant willfully violated the automatic stay by selling Debtor's vehicle post-petition. Debtor's damages consist of $6,579.57 for loss of the vehicle, $300 for lost personal property, $2,356.70 for emotional distress damages, and reasonable attorney's fees. Post judgment interest is applicable to the damages award. A separate judgment will be entered contemporaneously herein in accord with this memorandum opinion.

The Clerk's office is directed to serve a copy of this opinion to the parties on the attached distribution list.

### *JUDGMENT*

Based upon the Memorandum Opinion of even date herewith, it is

**ORDERED AND ADJUDGED** that the Memorandum Opinion of even date herewith is made the judgment of the Court. It is therefore **ORDERED** that the judgment is hereby entered for Debtor–Plaintiff, Tarran M. Spinner in the amount of $10,236.27 plus post judgment calculated using the applicable federal rate and reasonable attorney's fees.

The Clerk's Office shall mail a copy of this Judgment to the parties on the attached distribution list.