In re Teresa G. THOMASON, Debtor.

Teresa G. Thomason, Movant,

v.

Chestatee Community Association, Inc., Respondent.

No. G11–25344–REB.

United States Bankruptcy Court, N.D. Georgia, Gainesville Division.

March 5, 2013.

---

**71.** *Id.* at 1329.

**74.** Doc. No. 22.

Alexander W. Suto, Taylor, Odachowski, Schmidt & Crossland, St. Simons Island, GA, for Debtor.

## *ORDER*

ROBERT E. BRIZENDINE, Bankruptcy Judge.

Before the Court is the Motion of Debtor–Movant, Teresa Thomason, for Damages and Sanctions for Violation of the Automatic Stay against Respondent Chestatee Community Association, Inc. as filed on June 18, 2012 (Docket Entry No. 66).[1] The Court scheduled this contested matter as initiated by Debtor for hearing and heard testimony on September 24 and September 25, 2012, and closing arguments of counsel on October 1, 2012. The Court took the matter under advisement and the parties have filed post-hearing briefs. Based upon a review of the evidence of record and the legal argument

---

1. Although this is a contested matter and not an adversary proceeding, the parties refer to Respondent as "Defendant," and so the Court will continue with that designation for purposes of clarity.

presented at the hearing and in the briefs as filed, the Court finds and concludes that the motion should be granted in favor of Debtor on the limited basis discussed herein.

As framed by Debtor, the issues presented are whether Defendant violated the automatic stay under 11 U.S.C. § 362(a) in sending a written notice of suspension of amenity privileges in the form of a letter to Debtor for unpaid homeowner's association fees, and if so, whether same was intentional and willful. Further, Debtor contends this alleged willful violation includes the confrontation that occurred between an agent of Defendant and Debtor following the sending of the letter with respect to Debtor's attempt to use a swimming pool in Defendant's amenities area with members of her family. It is Debtor's position that the foregoing conduct is sufficient to support the entry of an award of actual damages, including damages for emotional distress, costs, and fees, in addition to punitive damages against Defendant pursuant to Section 362(k) of the Bankruptcy Code.[2]

Regarding Debtor's allegation about the suspension notice, Defendant admits through counsel that its agent Community Management Associates, Inc. ("CMA") prepared and mailed a letter to Debtor informing her that amenity privileges had been suspended because of her delinquent account balance. See Trial Exhibits, Defendant's Exhibit 6 (Copy of Letter dated May 15, 2012). Defendant also concedes that it was aware of Debtor's pending bankruptcy case, but adds that neither CMA nor Ms. Jodi Phillips, the individual who caused the May 15 letter to be sent from CMA to Debtor, had actual knowledge that this case had been converted from a case under Chapter 13 to a case under Chapter 7. Defendant insists that the letter was sent in error because Debtor's bankruptcy case had not been noted in CMA's business records.

Further, Defendant states that there is no evidence CMA and Ms. Phillips received any specific instruction from Defendant to send the letter to the Debtor. In fact, CMA and Phillips had no knowledge that Debtor was a specific recipient of the notice as it was a form letter routinely sent to various property owners listed by address prior to the beginning of pool and tennis season.[3] After counsel for Defendant informed Ms. Phillips that Debtor's pending bankruptcy case had been converted, she sent a retraction letter to Debtor and the records of CMA were corrected to reflect the conversion. See Plaintiff's Exhibit 4. At most, Defendant contends, this situation should be characterized as resulting from an inadvertent mistake that was corrected upon its discovery, and there is no evidence of willfulness to violate the stay.

---

**2.** In her motion, which Debtor originally filed *pro se,* Debtor also seeks damages for alleged violation of her constitutional rights against unlawful arrest and seizure under the Fourth Amendment to the United States Constitution, and her rights of due process and equal protection of the law under the Fourteenth Amendment, and she asserts Defendant is liable for the torts of false arrest and false imprisonment and seeks entry of a permanent restraining order.

**3.** The letter is addressed "Dear Chestatee CA Homeowner," and the envelope bears the name and address of Debtor along with Mr. Phillip Thomason, Debtor's husband. Ms. Phillips testified such letters are routine, and her testimony regarding her lack of knowledge about the conversion at the time the notice was sent is corroborated by Daniel Melchi, Defendant's attorney, who stated he told CMA members about Debtor's bankruptcy case status on June 6, 2012. See Post-Hearing Brief of Respondent, page 14 (Docket Entry No. 84).

Debtor argues, however, that the knowledge of Defendant and its counsel, Daniel Melchi, should be imputed to everyone associated with Defendant, including its agents such as CMA and Ms. Phillips, and that Melchi failed to perform his duty to inform everyone about the situation. Moreover, Debtor avers that she believed the letter contained an implicit threat to have her or any member of her family arrested for criminal trespass if they attempted to enter upon Defendant's property and use the amenity area. As she claims, Defendant "intended to and did carry out its threat to deny Plaintiff [Debtor] her legal rights." *See* Closing Brief (of Movant), ¶ 3, page 5 (Docket Entry No. 83).

Further, Debtor refers to assurances she received from Defendant's counsel Mr. Melchi during a telephone conversation following receipt of the letter, during which he allegedly indicated Debtor could use the amenity area without fear of harm. This call, Debtor insists, was part of an elaborate, intentional, and malicious pattern of behavior on behalf of a group of persons associated with Defendant to lure Debtor into a situation where she could be arrested in front of her family. Debtor even claims that she was afraid to leave her home and suffered extended periods of anxiety and distress leading to health issues requiring medical care.

Regarding the pool incident, Debtor alleges that following her conversation with Mr. Melchi, she visited Defendant's swimming pool with members of her family around 8:00 p.m. on the evening of June 7, 2012. Soon after their arrival, Mr. Bob Cook, a community resident, member of Defendant's board, and overseer of its recreational amenities, came to the site, confronted Debtor, and called the Dawson County Sheriff's Department. Mr. Cook testified that he had reason to suspect the group was trespassing upon Defendant's property. It is disputed whether Debtor refused to identify herself to Mr. Cook as a resident of the community, or whether she informed him that Defendant's lawyer had authorized her use of the amenity area before Cook contacted the sheriff's department.

Debtor argues that whether or not Mr. Cook knew who she was at the time, which he testified he did not, he is charged with knowledge of her bankruptcy case at the time he challenged Debtor at the pool and allegedly told her she was under arrest. Further, Mr. Cook was acting as an agent of Defendant and, therefore, under the doctrine of respondeat superior, Defendant is liable for Cook's alleged tortious conduct, as well as that of Mr. Melchi and Ms. Phillips. Debtor maintains that Mr. Cook's actions must be viewed in connection with the threatening collection letter she received from Ms. Phillips and the representations made by Mr. Melchi regarding her right to use the amenities, all of which helped to create this unfortunate episode and evidences a willful effort by Defendant to cause Debtor harm and injury.

While Defendant concedes an incident occurred around the pool on June 7, it vigorously denies the embellishments it contends Debtor adds to her description of this event. According to Mr. Cook, he had been notified that an unknown group of people were using the pool area, and that a child had been passed over the fence to open the gate. He then proceeded to the site to investigate and establish the identity of Debtor's group. The only vehicle he observed in the parking lot had an out of county tag, and he sought to determine if they were residents of the community or their guests, or if they were trespassing. Mr. Cook also stated, and Debtor conceded, that Debtor was free to leave at all

times. Mr. Cook said he only called the sheriff's office because Debtor was being uncooperative in his attempt to find out who she was or where she lived. Mr. Thomason testified that upon being called to the pool, he witnessed a chaotic scene as the children were very worried Debtor was going to be arrested.

After arriving at the pool area, the peace officer determined that a misunderstanding had occurred between the parties. According to the evidence, he questioned those present, including Mr. Thomason, who testified that he described the ongoing dispute between Defendant and Debtor to the deputy, including the phone call from Mr. Melchi and Debtor's efforts to obtain an injunction in state court. The officer noted in his report that in response to Mr. Cook's question to Debtor asking if she was a resident and if she had a key card, Debtor became "upset" and told Cook "she did not have to tell him where she lived." It appears that neither Debtor nor Mr. Cook knew the other's identity at the time the incident occurred. The officer concluded that there was no need for anyone to be charged or arrested and everyone left the scene. *See* Defendant's Exhibit 1 (Investigative Report). Debtor states through family members that following the incident, she has suffered various periods of emotional distress requiring medication, and that her daughter experienced an anxiety attack.

Based on the foregoing series of events, Debtor claims Defendant willfully violated the protection afforded her by the automatic stay as a debtor in a bankruptcy case for which she seeks monetary relief for both actual and punitive damages.[4] In response, Defendant challenges the suffi-

ciency of Debtor's evidence regarding her claim for compensable damages due to an alleged willful violation of the stay, which it disputes, and the resulting emotional distress claimed by Debtor, as well as other factual and legal merits of Debtor's case. As mentioned above, this matter came on for trial lasting over a period of several days.

\* \* \* \* \* \*

■ The automatic stay is a fundamental tenet of federal bankruptcy law protecting debtors and also creditors, and its effect is immediate on the filing of a case upon all persons and entities irrespective of notice. Actions taken subsequent to such filing as specified in the Code are in violation of the automatic stay and void *ab initio.* *See Borg–Warner Acceptance Corp. v. Hall,* 685 F.2d 1306 (11th Cir. 1982). Further, intentional acts taken against a debtor or property of her bankruptcy estate after a case has been filed and with knowledge of same may be punishable as contempt of court, subjecting the actor to "actual damages, including costs and attorneys fees" for a willful violation of the automatic stay. *See generally Carver v. Carver,* 954 F.2d 1573 (11th Cir.), *cert. denied,* 506 U.S. 986, 113 S.Ct. 496, 121 L.Ed.2d 434 (1992) (referring to former Section 362(h)); *see also Jove Eng'g, Inc. v. Internal Revenue Service,* 92 F.3d 1539, 1555 (11th Cir.1996). A debtor, however, must establish a willful violation of the stay by a preponderance of the evidence. *See Spinner v. Cash In A Hurry, LLC (In re Spinner),* 398 B.R. 84, 94–95 (Bankr.N.D.Ga.2008).

■ To be clear, and as discussed further below, Section 362(k) does not con-

---

**4.** As mentioned above, Debtor also claims Defendant violated her constitutional rights. Consistent with the presentation and argument of counsel, however, this Court will

restrict the scope of its analysis and ruling herein to the allegations of a willful violation of the automatic stay.

tain a specific intent requirement the part of the party accused of willfully violating the stay. A *debtor* need show only that the party accused of violating the stay had knowledge of the stay and acted intentionally. Punitive damages may also be warranted when a party is shown to have proceeded with malice or in bad faith. *See In re Esposito,* 154 B.R. 1011 (Bankr. N.D.Ga.1993) (discussing *former* Section 362(h)).[5]

■ As described above, Debtor's claim centers upon two events. Applying the above legal standard to the facts as established, the Court finds and concludes that the evidence offered at trial is sufficient to show that Defendant violated the automatic stay when it caused the letter in question dated May 15 to be sent to Debtor through CMA as its agent.[6] This form letter can be reasonably construed as an attempt to enforce the payment of a past due balance through the suspension of Debtor's amenity area privileges for her as well as members of her family or guests. This conclusion is not altered by the fact as testified by Ms. Phillips that such letters are sent as a reminder and out of respect to homeowners so that they do not attempt to enter the pool area, only to find that their swipe cards do not work. Even if intended as a courtesy, the letter is still intended to encourage the homeowner to

check their account and make arrangements to bring it current as needed.

In addition, whether or not Ms. Phillips had personal knowledge that Debtor had converted her bankruptcy case, or whether or not she knew that one of her letters that day was addressed to this particular Debtor, the letter on its terms constitutes an effort to collect a pre-petition debt from the Debtor. Under her direction, Ms. Phillips did intentionally cause the subject letter to be prepared and mailed to the Debtor, even if done so along with other, similar letters to different persons notifying them of their unsatisfied account obligations as homeowners and members of the Chestatee community.

■ The question presented, however, is whether the violation was *willful* in that Ms. Phillips' action was taken with knowledge of the stay as *imputed* to CMA and Phillips from Defendant as Defendant's agent in managing the property, and/or from Defendant's attorney Mr. Melchi, such that *Defendant* is liable for same.[7] Based on the evidence presented and the testimony of Ms. Phillips, which the Court finds to be credible, although she knew Debtor had filed a case under Chapter 13, CMA and Phillips lacked knowledge that the case had been converted to a case under Chapter 7 and that the transmission

---

**5.** Section 362(k) states as follows:

... an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorney's fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(k)(1).

**6.** Defendant conceded as much through counsel during closing argument.

**7.** As mentioned above, it is Debtor's position that Defendant's knowledge of the automatic stay should be imputed to Ms. Phillips, Mr.

Cook, Mr. Melchi, and Mr. David Boy, IV, that Defendant is liable for their allegedly tortious acts, and that each of them is individually liable for the harm caused Debtor No specific tort has been alleged or proven, however, and the issue presented to this Court concerns a willful violation of the automatic stay. In addition, as discussed hereafter, Debtor has neither put forth a viable legal theory nor proven a set of facts for holding these entities and individuals jointly liable for the acts of the others in connection with Debtor as knowing participants in a common enterprise. Moreover, only Defendant is a named Respondent in this contested matter.

of the letter at the time it was sent, was not, therefore, appropriate.[8]

As noted above, Defendant concedes through counsel that sending the letter constituted a "technical violation" of the stay, and that Defendant is properly charged with constructive knowledge of Debtor's converted bankruptcy case from its attorney, Mr. Melchi, who is Defendant's agent. Hence, Defendant is deemed to know about the stay and admittedly took action through another agent, CMA and Ms. Phillips, in preparing and transmitting the letter to Debtor. Under accepted principles of agency law as argued by Defendant, however, while the knowledge of an agent can be imputed to the principal, the converse is not true and the knowledge of the principal, Defendant herein, is not imputed to its agent the CMA and its employees.[9]

In other words, as Defendant maintains, the issue is not what *Defendant* as *principal* knew. Instead, acting through its agent, the issue is whether there was willfulness on the part of the *agent* to violate the stay in relation to Debtor's bankruptcy case. Simply put, what did the *agent* know and when did he or she know it? According to Defendant, therefore, willfulness requires a showing that Ms. Phillips acted with knowledge of the stay in sending the May 15 suspension letter. Since Ms. Phillips did not have such personal knowledge and merely acted unknowingly in error, there was no willfulness on her part regarding her actions in connection with the stay. Thus, Defendant states there are no grounds for attributing liability to Defendant for a willful violation based on the sending of the letter.

Defendant advances a similar legal argument with respect to the second act constituting an alleged violation regarding the encounter between Debtor and Defendant's agent, Mr. Cook, on June 7. For this reason, the Court will offer its analysis of "willfulness" under Section 362(k) and address both alleged violations at the same time, and so the Court next proceeds with an examination of the facts surrounding the pool incident.

\* \* \* \* \* \*

Even though Mr. Cook served as a voluntary member of the board and could be charged with notice of Debtor's bankruptcy in such capacity, he testified that he did not know he was confronting the Debtor that night. In fact, the Debtor's identity as a resident of the community was the very thing Mr. Cook sought to determine as part of his duties supervising use of the Defendant's recreational amenities. Cook further testified that persons outside the community had attempted to use the pool on earlier occasions, and that he became

---

8. Ms. Phillips testified that because she understood Debtor's case remained pending under Chapter 13, Debtor's post-petition balances could be the subject of a letter such as the one sent on May 15, 2012. Mr. Melchi stated that he learned of the conversion of Debtor's case on March 8 and that he typically informs his creditor clients of such information, in this case Defendant. Ms. Phillips further testified that she became aware of this development from Mr. Melchi via e-mail on June 6, and that she immediately prepared the retraction letter, which she personally signed, and also acted to reinstate Debtor's pool swipe card later that night.

9. This assertion appears to reflect a correct statement of the law. *See Waswick v. Stutsman County Bank (In re Waswick)*, 212 B.R. 350, 352 & n. 3 (Bankr.D.N.D.1997) (imputation rests on presumption that agent will disclose facts discovered acting within scope of agency relationship in which there is an identity of interests). Defendant also agrees that under the relevant legal standard for willfulness, proof of a specific intent to violate the stay is not necessary.

concerned when he was told by another homeowner that she had witnessed persons in Debtor's group passing a small child over the fence and into the pool area. Debtor states that in response to Cook's questions, she said she had no card key but affirmed to him that she was indeed a resident. Mr. Cook testified that Debtor did not provide her name or address until *after* he called the sheriff's office to report trespassers at the pool.

Mr. Thomason recalled that when he arrived at the pool that evening, the adults were upset and the children were crying and afraid Debtor was going to be taken to jail. As mentioned above, a peace officer was then present on the scene, and Mr. Thomason stated he produced his driver's license along with that of his wife for the deputy's inspection. Thomason also referred the officer's attention to the petition for an injunction the Thomasons filed against Defendant based on the May 15 letter.

As a matter of background, as part of his testimony, Mr. Thomason stated he also recalled a telephone conversation that took place earlier on June 7 with Mr. Melchi. He further testified that they had sought the aforementioned injunction due to their concern about the grandchildren and he also mentioned that Defendant does things "not necessarily in a neighborly way." He did not elaborate on this point and neither explained what he meant

nor offered a basis for such a statement at the trial other than, perhaps, Defendant's stated intention through CMA in the letter that past due assessments must be brought current and that it is serious about enforcing such obligations.[10] Mr. Thomason said they lacked clarity in understanding what the letter meant in terms of a 'restraint action' or 'trespass' in regard to any attempted entry by them onto Defendant's property.[11]

On the other hand, Mr. Melchi had previously testified that the day after he learned the letter had been sent, he contacted Mr. Thomason about the letter and the injunction application. He informed Thomason that the letter should not have been sent, and said that he had been in contact with CMA and the Thomasons' pool card key access to the amenities area would be restored. Melchi further testified, however, that he did not respond to Mr. Thomason's line of questioning to him about Ms. Phillips' alleged advice that Defendant should call the police on various people for entering amenity property. Mr. Melchi also did not recall saying to Mr. Thomason that he could enter the pool area without fear of being arrested, but did say that he should not have any problems using the card key.[12] Defendant argues that Debtor's characterization of Mr. Melchi's representations are clearly embellished and self-serving.

---

10. Debtor argues, but offered no evidence to support, that Defendant was acting in retaliation in sending the letter (Closing Brief, p. 12).

11. Defendant states the letter related to use of the amenities and not the common area. As testified by Ms. Phillips, the May 15 letter only addresses amenity use suspension, and not the right to enter upon the common property of Defendant as defined in the protective covenants (*See* Defendant's 27 Article XI, section 2(a)(ii), Exhibit "A," (f)). Further, Defen-

dant suggests that Debtor's lack of understanding or her feeling of being threatened may result more from her failure to appreciate why Defendant would seek to restrict access to its amenity areas to Chestatee members than from anything Defendant actually did in sending the letter or asking for identification at the pool.

12. Mr. Melchi also stated that he notified Defendant regarding the conversion of Debtor's bankruptcy case to a case under Chapter 7.

According to Mr. Thomason, having received assurances from Mr. Melchi that the letter would be retracted and that they could indeed use the pool with safe passage and a new pool pass would be issued, the Thomasons decided to use the pool that night.[13] When asked why he kept referring to an apprehension of Debtor's impending arrest at the pool, Mr. Thomason shared that he based his observation on Mr. Cook's statement to the deputy that he wanted her arrested. Mr. Thomason also said that he based his concern about the possibility of an arrest on the suspension letter sent by the CMA and the fact that in their view, the Thomasons had needed to file for an injunction.

Debtor similarly testified that based on the letter, she believed that if she did not pay her dues and entered upon Defendant's amenity property, the police would be called and she would be arrested. She also testified she told Mr. Cook her name and address that night before he dialed 911, and that he would not let them leave despite her pleas. She stated that she is not comfortable living in this neighborhood apparently due to her financial situation and feels her neighbors do not care.

Returning to the events of the pool incident, Mr. Thomason testified that he showed the deputy the superior court pleading regarding the injunction and after speaking with Mr. Cook, the deputy concluded that this situation seemed to be a civil dispute between the parties and there was no probable cause for an arrest. Mr. Cook later determined upon e-mail inquiry to Ms. Phillips following the incident that Debtor did in fact have a right to access the pool. Mr. Cook also affirmed in his testimony that he never told Debtor or anyone in her party that night that they were under arrest. He testified that he did not ask the deputy to arrest the Debtor or or in fact, to do anything, and that Mr. Thomason had requested the incident report.

\* \* \* \* \* \*

First, reading the letter, the Court observes that while it does state that "[u]sing the amenity area without settling this matter is considered trespassing and can result in fines or other legal action" (Defendant's Exhibit 6), the Court does not find that it contains evidence of either a direct (Closing Brief, ¶ 6) or an implicit (Closing Brief, ¶ 21) personal threat to arrest Debtor for criminal trespass if she entered onto its property. The letter is reasonably construed as merely clarifying the status of a homeowner's right to use amenity privileges when they owe past due association obligations. It also communicates the degree of seriousness with which Defendant views such a situation and the expectation that it be addressed by the homeowner. Further, based on its observation of the witnesses during their testimony, the Court finds it reasonable to conclude that Mr. Cook contacted the sheriff's office because of Debtor's refusal to furnish him with her name and address, even if Debtor believed, in her mind, that she was justified in doing so.

Next, Debtor cites the decision of *Johnson v. Smith (In re Johnson)*, 501 F.3d 1163, 1171–72 (10th Cir.2007) in reiterating that a specific intent to violate the stay is not necessary—it need only be shown that the action in question as taken was intentional and done so with knowledge of the stay. This Court observes that the Tenth Circuit also provides an important insight into the meaning of willfulness. Analyzing prior case history, the circuit court notes that the definition of willfulness in Section

---

13. Mr. Thomason further testified that he had discussed with Debtor that day whether it was advisable to go to the pool and whether they trusted Mr. Melchi.

362(k) differs from that contained in Section 523(a)(6) because in the case of the former, a lower standard of proof is provided.[14] The requisite showing of willfulness under Section 362(k) as broadly construed serves to vindicate the fundamental nature of the protection afforded debtors by the automatic stay. 501 F.3d at 1171 n. 7, 1172.

In addition, as stated above, while Defendant is correct in its contention that a principal's undisclosed knowledge is not imputed to its agent, Defendant is not correct in insisting that it cannot be held liable for the intentional acts of its agents that violated the automatic stay. Defendant had knowledge of the conversion of Debtor's case to Chapter 7 and the automatic stay from its agent Mr. Melchi, yet it continued to act through another agent, CMA and Ms. Phillips, to assert its rights in connection with the collection of the past due homeowner's assessment of Debtor. Even if Defendant did not specifically instruct that the May 15 letter be sent, CMA had been authorized to send this type of letter to homeowners on Defendant's behalf and proceeded to send the letter based on that ongoing authority. Again, proof of a specific intent to violate the stay is not necessary.

Further, as between Debtor and Defendant, and even if the letter was sent in error, in view of the fundamental nature of the stay and the balancing of interests required thereby, it is Defendant who should have acted on the information it possessed in connection with its agent. *See Manzanares v. State Farm Fire & Cas. Co. (In re Manzanares)*, 345 B.R. 773, 792–93 (Bankr.S.D.Fla.2006) (cites omitted); *accord Johnson*, 501 F.3d at 1169–72. Thus, while CMA, who is not a named respondent herein, is not liable, Defendant is liable for a willful violation of the stay because it acts through its agent who intentionally sent the letter and who had been intentionally authorized to send such letters, and Defendant knew facts that would have altered such action by its agent.[15]

Similarly, with respect to the confrontation between Mr. Cook and Debtor at the pool, it is undisputed that Defendant had knowledge of the stay. Whether Mr. Cook can be said to have shared this knowledge as a legal matter as a member of its board, or even if he did not, still, his act in challenging Debtor's use of the pool amenity until he established her identity and corollary right to use the pool was intentional, even if not specifically directed toward a known debtor in a bankruptcy case. It is understandable to presume a willful violation of stay means evidence that a

---

14. By contrast, under Section 523(a)(6) it *must be shown not only that the act at issue was intentional but that the injury itself which resulted from the act was intended by the* actor. *Johnson*, 501 F.3d at 1171, citing *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).

In addition, the Court notes that although the Eleventh Circuit appears to refer to willfulness in terms of taking of an action with a callous indifference to the consequences, its holding actually rests upon the test described above in requiring only knowledge of the stay coupled with an intentional action. *Jove Eng'g*, 92 F.3d at 1555–56.

15. The Court does not accept Debtor's contention that liability against Defendant may be sustained relying on the doctrine of respondeat superior, as the Court finds that there is no employment relationship between Defendant and either Mr. Cook, a board member, or Mr. Melchi, its attorney. *See generally Littlefield Constr. Co. v. Bozeman*, 314 Ga.App. 601, 603, 725 S.E.2d 333, 335 (2012). In addition, a strict employment relationship has not been shown to exist between Defendant and Ms. Phillips who is instead employed by CMA, a separate entity. In any event, liability is imposed against Defendant based on the legal grounds as stated above.

person acted willfully in relation to the bankruptcy. But again, the applicable legal standard only requires knowledge of the stay and an intent to do the act which constitutes the violation—not an intent to produce the violation itself. It is the breadth of the interest at issue, the protection afforded by the automatic stay, that justifies the generous nature of this legal test in favoring debtors. *See Johnson*, 501 F.3d at 1171 n. 7, 1172 (cites omitted); *see also Manzanares*, 345 B.R. at 793 n. 15. *Accord Jove Eng'g, Inc.*, 92 F.3d at 1555–56.

\* \* \* \* \* \*

■ Having determined Defendant is liable for a willful violation of the stay in both the sending the letter and the confrontation with Debtor at the pool, given its knowledge of the bankruptcy conversion and the failure to communicate same to its agents who performed acts on its behalf, the Court turns to the question of an appropriate remedy to be imposed against Defendant. Section 362(k) provides that actual damages shall be recovered by an individual debtor injured through a willful violation of the stay, and these include out-of-pocket loss and costs and attorney's fees incurred in handling the violation. Damages in compensation for emotional distress may be awarded in proper circumstances as actual damages, and punitive damages may also be awarded.

■ The Court has reviewed Debtor's estimate through counsel of compensatory damages including prescription costs, emergency care, and her costs in preparing for trial. Debtor also seeks attorney's fees in an amount exceeding $8,600.00. For emotional distress, Debtor seeks damages in a range of $5,000.00 to $10,000.00, and $500.00 a piece for various family members. As an initial matter, the Court concludes that no damages will be awarded

for the emergency care sought by Candace Williams in the amount of $3,100.00, as damages under Section 362(k) are restricted to the Debtor alone, or, in any event, were not shown to have resulted from the incident in question with sufficient clarity. *See Rushing v. Green Tree Serv., LLC (In re Rushing)*, 443 B.R. 85, 100–01 (Bankr. E.D.Tex.2010) (non-debtor not within zone of interests protected by Section 362(k)); *see also Grine v. Chambers (In re Grine)*, 439 B.R. 461, 469 (Bankr.N.D.Ohio 2010) (non-debtor's alleged loss not shown to have resulted from stay violation). Similarly, damages for emotional distress for non-debtor family members will not be awarded, and the Court does not find Debtor's argument persuasive that same are warranted as compounding her own suffering.

■ With respect to damages, Debtor must prove same with "reasonable certainty," and they "must not be speculative or based on conjecture." *Grine*, 439 B.R. at 468–69. Similarly, the Court should be presented with an adequate, itemized basis to analyze the amount sought as attorney's fees so that a determination can be made concerning their reasonableness and their relation to addressing the stay violations at issue. *Id.*, at 471–72. With regard to attorney's fees, counsel for Defendant argues that same should be commensurate with the work needed to overturn the stay violation. Here, extensive litigation was unnecessary since the letter was already retracted and use of the pool restored through issuance of a new swipe card. Counsel also introduced statements from settlement negotiations in support of the argument that Debtor's claim for damages was wildly over-estimated, and that any award of attorney's fees should be reduced accordingly. *See* Post–Hearing Brief at 24–25; *Dawson v. Washington Mut. Bank, F.A.*

*(In re Dawson),* 390 F.3d 1139, 1152 (9th Cir.2004).[16]

▮▮▮▮ To support an award of damages attributed to emotional distress, Debtor must show through a preponderance of the evidence that such harm was significant and clearly established, and that there is a demonstrable causal connection between the conduct found to be a willful violation of the stay and the harm caused thereby as alleged to have been endured. *See Spinner,* 398 B.R. at 96, citing *Dawson,* 390 F.3d at 1148–49; *see also Bishop v. U.S. Bank/Firstar Bank (In re Bishop),* 296 B.R. 890, 895–97 (Bankr. S.D.Ga.2003); *Poole v. U.B. Vehicle Leasing, Inc. (In re Poole),* 242 B.R. 104, 112 (Bankr.N.D.Ga.1999).[17] A debtor may establish entitlement to such a recovery through corroborating testimony in the form of medical evidence, as well as testimony from family members, or same can be inferred by the Court based on the nature of the underlying conduct. *Dawson,* 390 F.3d at 1149–50. In sum, such damages may be awarded without identifiable financial loss, corroborating evidence, or proof of egregiousness if it is shown the debtor "in fact suffered significant emotional harm and the circumstances ... make it obvious that a reasonable person would suffer significant emotional harm." *See Dawson,* 390 F.3d at 1151; *see also Bishop,* 296 B.R. at 896–98.

In terms of her own medical care, Debtor relies on non-expert witness testimony as is permissible, but there is no evidence to suggest how her blood pressure was directly affected by the events in question, such as recorded measurements of same before and after these occurrences. It appears that Debtor has experienced emotional strain as she describes and that the scene at the pool was difficult. Yet, the evidence does not demonstrate a sufficient causal link between the incidents in question and other factors that may be contributing to the anxieties Debtor recounts from living in her neighborhood, and that may include the filing of the bankruptcy case, which, in and of itself, is no doubt stressful.

▮▮ In any event, based upon the foregoing legal standard and a review of the record and trial testimony presented, the Court finds that an award of nominal damages in the amount of $1,250.00 is appropriate in the circumstances to compensate Debtor for her emotional stress and anxiety in addition to any medically-related costs resulting from same. In addition, based on the record, attorney's fees and costs as reasonably expended in connection with addressing the events that constituted a violation of the automatic stay are awarded in the amount of $1,750.00.

\*      \*      \*      \*      \*      \*

▮▮▮ Finally, the Court finds and concludes that Debtor has not established by clear and convincing evidence that these stay violations, in both the sending of the letter and the incident at the pool, were so egregious in nature that they display a callous defiance of federal law or betray a malicious intent to cause harm, such that punitive damages are needed to cause a change in behavior. *See generally John-*

---

**16.** Ordinarily, the content of settlement negotiations is not reported to the Court. If nothing else, in this instance the fact that Debtor initially sought nearly one-half million dollars at the hearing, and substantially decreased that demand to $70,000.00 and perhaps even $13,000.00, tends to raise questions concerning the basis of Debtor's claim.

**17.** Such harm may quality for damages even in the absence of other damages. *See Bishop,* 296 B.R. at 897; *see also Dawson,* 390 F.3d at 1150–51; *but see Aiello v. Providian Fin. Corp.,* 239 F.3d 876 (7th Cir.2001).

*son,* 501 F.3d at 1171; *Bishop,* 296 B.R. at 898. According to Ms. Phillips' testimony, which the Court finds believable, the May 15 suspension letter was sent as a mistake. Despite Debtor's allegations, the Court finds that she has not shown the letter was sent in retaliation, or that it constitutes a threat of criminal prosecution for trespass as part of an intentional effort to harm or injure Debtor.

Further, as testified by Mr. Cook, he did not personally know the Debtor at the time of the pool incident. In his testimony, which the Court finds credible, Cook stated that he had no reason in the circumstances confronted to believe that he was addressing Ms. Thomason as a resident of the community, much less a debtor in bankruptcy, as opposed to a non-resident without authority to enter and use the amenity area facilities. His suspicion, based on a message he received about persons using the pool, formed the basis of his decision to go and investigate in the first place. While Debtor contends she did cooperate and make her identity known to Mr. Cook before he called the sheriffs office, the Court does not find this statement to be credible. She also stated at one point that she never felt that she could not leave the pool area. Based on his assessment of the situation, Mr. Cook's decision to call 911 to prevent the matter from escalating out of hand appears reasonable. Further, it does not demonstrate the continuation of a willful campaign to proceed in violation of the stay by harassing Debtor and/or threatening her with arrest to force collection of a debt from her or to retaliate against her as a debtor in a bankruptcy case.

Debtor argues that the web of relationships among certain agents of Defendant along with their respective actions somehow establishes an overall pattern of intimidation targeting Debtor through the sending of the collection letter, deceiving Debtor into entering upon Defendant's property, and working to have Debtor arrested. Yet, Debtor has presented no plausible evidence of a preconceived plot as directed toward a specific, shared goal and carried out through discrete acts with such intent by Ms. Phillips, Mr. Melchi, Mr. Cook, or anyone else associated with Defendant. Simply stated, based on the events in question, Debtor offers grand allegations that these persons set out to violate her rights and, although she describes a number of occurrences involving these persons and Debtor, she fails to show a connection between these actions through competent evidence to support her claim that these persons joined in a collective, planned effort against her to violate the stay.[18]

■ The consequences endured by Debtor and members of her family are unfortunate. It appears, however, that any alleged coordinated and sustained scheme by Defendant and its agents to threaten Debtor, make her afraid to live in the community, and violate her legal rights exists chiefly in Debtor's perception. It is lamentable that much of the distress of which she now complains could have ap-

---

**18.** Debtor also contends that under the doctrine of foreseeability, Mr. Melchi is responsible as a tortfeasor for any damages occurring as a result of the failure to notify Defendant of Melchi's assurance to Debtor's husband regarding use of the amenity area. Closing Brief, at 15, 21; Plaintiff's Reply to Defendant's Post–Hearing Brief, at 5. Mr. Melchi, however, is not named as a respondent herein and the Court does not accept such a broadly defined duty in any event, nor has Debtor furnished proper legal authority for imposing liability in this setting based on such proposition. Further, as noted earlier, this Court focuses herein on the alleged violation of the stay, and not independent theories of liability under tort law, which have not been proven in any case.

parently been avoided by using common sense, instead of choosing to produce or facilitate some kind of showdown. The automatic stay exists to protect debtors. But, it is not intended to be used as a means for recovering punitive damages anytime a debtor feels singled out in otherwise reasonably explainable situations occurring as a consequence of everyday human interaction and contact.

\* \* \* \* \* \*

Accordingly, based on the above findings of fact and conclusions of law, it is

ORDERED that the Motion for Damages and Sanctions for Violation of the Automatic Stay filed herein by Debtor–Movant Teresa Thomason on June 18, 2012 (Docket Entry No. 66) be, and the same hereby is, **granted** to the extent set forth herein; and, therefore, it is

FURTHER ORDERED that actual compensatory damages and reasonable attorney's fees are **awarded** to Debtor from Defendant [Respondent] Chestatee Community Association, Inc. in the total amount of $3,000.00. No award is made herein for punitive damages as the grounds for same have not been shown.

The Clerk is directed to serve a copy of this Order upon counsel for Debtor–Movant, counsel for Respondent, the Chapter 7 Trustee, and the United States Trustee.

**IT IS SO ORDERED.**